United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued October 6, 1997 Decided February 13, 1998 

 No. 96-1497

 Appalachian Power Company, et al., 

 Petitioners

 v.

 Environmental Protection Agency, 

 Respondent

 Public Service Electric & Gas Company, et al., 

 Intervenors

 Consolidated with

 No. 97-1091

 On Petitions for Review of an Order of the 

 Environmental Protection Agency

 F. William Brownell argued the cause for petitioners 
Appalachian Power Company, et al., with whom Henry V. 
Nickel and Craig S. Harrison were on the briefs.


 Thomas Sayre Llewellyn argued the cause for petitioner 
Arizona Public Service Company, with whom George Y. Sugi-
yama and Michael B. Wood were on the briefs. Munford P. 
Hall II entered an appearance.

 Scott J. Jordan and Wendy L. Blake, Attorneys, United 
States Department of Justice, argued the cause for respon-
dent, with whom Lois J. Schiffer, Assistant Attorney General, 
and Dwight C. Alpern, Attorney, Environmental Protection 
Agency, were on the brief.

 Richard E. Ayres, John H. Sharp, and John H. Cheatham 
III were on the brief for intervenor Natural Gas Supply 
Association, et al.

 Harold P. Quinn, Jr., was on the brief for intervenor 
National Mining Association.

 Andrew J. Gershon and J. Jared Snyder, Assistant Attor-
neys General, State of New York, Brian J. Comerford, Assis-
tant Attorney General, State of Connecticut, Edward G. 
Bohlen, Assistant Attorney General, Commonwealth of Mas-
sachusetts, Jeffrey A. Meyers, Assistant Attorney General, 
State of New Hampshire, and David Rocchio, Assistant At-
torney General, State of Vermont, were on the brief for amici 
curiae New York, Connecticut, Massachusetts, New Hamp-
shire, and Vermont. Lisa M. Burianek, Assistant Attorney 
General, State of New York, entered an appearance.

 Before: Wald, Henderson, and Garland, Circuit Judges.

 Opinion for the Court filed Per Curiam.


 Per Curiam1: This case revisits Title IV of the Clean Air 
Act ("the Act"), which, inter alia, directs the Environmental 
Protection Agency ("EPA") to promulgate limits on the emis-
sion of nitrogen oxides from various electric utility boilers. 
In Alabama Power Co. v. EPA, 40 F.3d 450 (D.C. Cir. 1994), 
we invalidated the first set of these emission limits as exceed-
ing EPA's statutory authority.2 We are now presented with 
a challenge by a number of electric utilities and industry 
groups 3 to the next group of nitrogen oxides emission limits 
promulgated under the Act: a more stringent revision of the 
first set of emission limits and a new set of emission limits for 
a second group of boilers. This time, we uphold the bulk of 
the challenged rule, concluding that EPA has not exceeded its 
authority and cognizant of the deference due to an agency 
dealing with largely scientific and technical matters. We 
vacate, however, the portion of the final rule that reclassifies 
certain retrofitted cell burner boilers as wall-fired boilers and 
remand it to EPA for reconsideration or a more adequate 
justification.

 I. Background

 Among the 1990 amendments to the Clean Air Act, 42 
U.S.C. s 7401 et seq. (1994), was Title IV, which was designed 
to reduce the adverse effects of acid deposition (more com-
monly known as "acid rain") from the atmosphere by limiting 
the allowable emissions of sulfur dioxide (SO2) and nitrogen 
oxides (NOx), two principal sources of acidic compounds. See 
42 U.S.C. s 7651 (1994) (congressional findings and pur-
poses). Electric utilities such as Appalachian Power contrib-
ute to NOx emissions through the burning of coal, which 

__________
 1 Judge Wald authored the Introduction and Parts I, II.A, II.C, 
and III. Judge Garland authored Parts II.B and II.D.

 2 EPA subsequently repromulgated these limits in accordance 
with our opinion. See Acid Rain Program; Nitrogen Oxides Emis-
sion Reduction Program, 60 Fed. Reg. 18,751 (1995).

 3 Because the named petitioner on this appeal is Appalachian 
Power Company, we refer to the petitioners as a group--except for 
Arizona Public Service Company, which has appealed separately--
as "Appalachian Power."


releases nitric oxide (NO) that reacts with elements in the air 
to form nitrogen dioxide (NO2) and other harmful pollutants. 
In 1990, electric utility emissions constituted approximately 
32 percent of total annual NOx emissions. See Acid Rain 
Program; Nitrogen Oxides Emission Reduction Program, 61 
Fed. Reg. 67,112, 67,112 (1996). In order to encourage a 
reduction in NOx emissions, Title IV directs EPA to set NOx 
emission limits for two groups of coal-fired electric utility 
boilers and divides those boilers into two additional groups 
for the purpose of setting compliance deadlines. A boiler 
therefore may be a "Group 1 boiler" 4 or a "Group 2 boiler," 5 
depending on its type, and may be a "Phase I boiler" or a 
"Phase II boiler," depending on when it is subject to emis-
sions limitations.6 There are both Group 1 boilers and Group 
2 boilers in each of the compliance phases.

__________
 4 Group 1 comprises tangentially fired boilers and dry bottom 
wall-fired boilers other than those applying cell burner technology. 
See 42 U.S.C. s 7651f(b)(1) (1994). A tangentially fired boiler's 
burners are located in the corner of the furnace, while a wall-fired 
boiler's burners are located along the furnace wall. Alabama 
Power, 40 F.3d at 452 n.1.

 5 Group 2 comprises wet bottom wall-fired boilers, cyclone boilers, 
cell burners, and "all other types of utility boilers." See 42 U.S.C. 
s 7651f(b)(2) (1994). Wet bottom boilers are characterized by a 
high internal temperature that converts ash into molten slag, which 
collects in a tank at the bottom of the furnace. Cyclone boilers are 
a type of wet bottom boiler in which the fuel and air are burned in 
horizontal, water-cooled cylinders called "cyclones." Cell burners 
are dry bottom boilers that have arrays of two or three closely 
spaced circular burners, forming a "cell," mounted on the wall of 
the furnace. Vertically fired boilers contain conventional circular 
burners or coal and air pipes oriented downward rather than 
horizontally, as in wall-fired boilers. Acid Rain Program; Nitrogen 
Oxides Emission Reduction Program, 61 Fed. Reg. 1442, 1456 
(proposed Jan. 19, 1996).

 6 The terms are derived from the statutory scheme regarding 
limits on SO2 emissions. See 42 U.S.C. s 7651f(a) (1994). In this 
scheme, boilers subject to the limitations in Phase I, see 42 U.S.C. 
s 7651c (1994), must comply with the limits by January 1, 1995; 
boilers subject to the limitations in Phase II, see 42 U.S.C. s 7651d 


 One method of reducing NOx emissions is to retrofit coal-
fired boilers with an emission control device. For Group 1 
boilers, such a device commonly consists of what is termed 
"low NOx burner technology," which, as we noted in Alabama 
Power, is an emission control method that limits the amount 
of oxygen available to react with the nitrogen in the coal and 
thus reduces the amount of nitrogen oxides formed. Ala-
bama Power, 40 F.3d at 452 n.3. The emissions from Group 
2 boilers are more difficult to reduce, and thus Group 2 
boilers are retrofitted with a greater variety of emission 
controls, including selective catalytic reduction,7 selective non-
catalytic reduction,8 gas reburning,9 and plug-in and non-plug-
in retrofits.10 Each control method can achieve varying levels 
of NOx emissions reduction.

 As we noted in Alabama Power, Congress intended in 
enacting Title IV "to tie the obligation of utilities to meet the 
NOx emission limit to the use of low NOx burners." Alabama 
Power, 40 F.3d at 455. To this end, section 407(b)(1) requires 
that the Group 1 limits be set at a maximum of 0.45 pounds 
per million British thermal units ("lb/mmBtu") for tangential-

__________
(1994), must comply by January 1, 2000. Failure to adhere to the 
prescribed limitations results in a fine. See 42 U.S.C. s 7651j(a) 
(1994).

 7 Selective catalytic reduction involves adding ammonia to the flue 
gas of the burner, which then passes through a catalyst, turning the 
NOx into molecular nitrogen and water. 61 Fed. Reg. at 1458.

 8 Selective noncatalytic reduction injects a reducing agent into the 
flue gas that reacts with the NOx in the gas to form molecular 
nitrogen and water. Id.

 9 Gas reburning involves the diversion of part of the primary fuel 
heat input to a location above the main burners. As flue gas passes 
through this area, part of the NOx formed is converted to molecular 
nitrogen. Id.

 10 Installing non-plug-in combustion controls on cell burners in-
volves replacing the portion of the wall containing the cell with a 
new wall containing widely spaced low NOx burners. Plug-in con-
trols, by contrast, replace the cells with low NOx burners, maintain-
ing the original cell configuration. Id. at 1457-58.


ly fired boilers and 0.50 lb/mmBtu for dry bottom wall-fired 
boilers, unless EPA finds that these rates cannot be achieved 
using "low NOx burner technology," a term not explicitly 
defined in the statute. The limits, which were to be set by 
May 15, 1992, would then apply to Group 1, Phase I boilers 
starting on January 1, 1995. 42 U.S.C. s 7651f(b)(1). EPA 
was permitted to revise the Group 1 limits by January 1, 
1997, to apply to Phase II boilers if it determined that "more 
effective low NOx burner technology [was] available." 42 
U.S.C. s 7651f(b)(2).11 If no such revision were undertaken 
by January 1, 1997, the limits established for the Group 1, 
Phase I boilers were to go into effect for the Group 1, Phase 
II boilers. EPA was also required to set by January 1, 1997, 
the NOx emission limits for Group 2 boilers. These limits 
were to be based "on the degree of reduction achievable 
through the retrofit application of the best system of continu-
ous emission reduction, taking into account available technolo-
gy, costs and energy and environmental impacts; and which 
is comparable to the costs of nitrogen oxide controls" set for 
the Group 1, Phase I boilers. 42 U.S.C. s 7651f(b)(2).

 On March 22, 1994, well past its statutory deadline, EPA 
promulgated the Group 1, Phase I emission limits. See Acid 
Rain Program; Nitrogen Oxides Emission Reduction Pro-
gram, 59 Fed. Reg. 13,538 (1994). The final rule defined "low 
NOx burner technology" to include overfire air, another emis-
sion control method, as well as low NOx burners themselves.12 
We invalidated the rule as inconsistent with EPA's statutory 
directive, holding that the term "low NOx burner technology" 

__________
 11 The statute provides that boilers subject to the Phase I emis-
sion limits set pursuant to section 407(b)(1) of the Act will not be 
subject to any revised limits. See 42 U.S.C. s 7651f(b)(2).

 12 Like low NOx burners, overfire air, as we noted in Alabama 
Power, reduces the amount of oxygen available to react with the 
nitrogen in the coal and thus limits the formation of NOx. It 
accomplishes this by removing oxygen from around the burner and 
reintroducing it to the boiler through a port above the burner. 
Alabama Power, 40 F.3d at 452 n.3.


was an "unambiguous reference to low NOx burners" that did 
not permit EPA to include additional control methods. Ala-
bama Power, 40 F.3d at 455. EPA subsequently revised the 
1994 regulations on April 13, 1995, to eliminate references to 
overfire air and established limits of 0.45 lb/mmBtu for 
tangentially fired boilers and 0.50 lb/mmBtu for wall-fired 
boilers, limits identical to those provided for in the statute. 
See 60 Fed. Reg. at 18,763; 42 U.S.C. s 7651f(b)(1). To 
account for the delay in promulgation, the compliance date for 
Group 1, Phase I boilers was moved to January 1, 1996. 60 
Fed. Reg. at 18,763.

 The rule at issue here, issued on December 19, 1996, 
promulgates the next set of emission limits under the statuto-
ry scheme: the revised NOx emission limits for Group 1, 
Phase II boilers as well as the NOx emission limits for Group 
2 boilers. 61 Fed. Reg. at 67,112. EPA revised the Group 1 
limits after determining, as required by section 407(b)(2), that 
boilers with low NOx burners were achieving lower emission 
levels than the limits promulgated in 1995 and therefore that 
more effective low NOx burner technology was available. 
(This determination was the result of a regression analysis in 
which EPA constructed equations capturing the reduction 
achieved by Group 1, Phase I boilers and applied these 
equations to the uncontrolled emission rates of Group 1, 
Phase II boilers.) In establishing the Group 2 emission 
limits, EPA interpreted its statutory directive to require a 
comparison of the cost-effectiveness of Group 2 controls and 
low NOx burner technology and thus promulgated emission 
limits for Group 2 boilers based on control technologies that 
were shown to be as cost-effective in reducing NOx emissions 
as low NOx burner technology. In addition, relying on sec-
tion 407(a), which states that a boiler becomes an "affected 
unit" for purposes of the NOx emission limits at the same 
time it becomes an affected unit for purposes of the SO2 
emission limits (established elsewhere in Title IV), EPA set 
January 1, 2000, as the date by which compliance with the 


new limits must be achieved.13 Finally, EPA determined that 
certain retrofitted cell burner boilers should be reclassified 
from Group 2 to Group 1, thereby subjecting them to the 
stricter emission limits applicable to the latter group.

 Appalachian Power and petitioner Arizona Public Service 
Company now seek review of these portions of the final rule, 
claiming that EPA's actions both exceeded its statutory au-
thority and were arbitrary and capricious.14

__________
 13 The emission limits established by the final rule were 0.40 
lb/mmBtu for tangentially fired boilers; 0.46 lb/mmBtu for dry 
bottom boilers; 0.68 lb/mmBtu for cell burners; 0.86 lb/mmBtu for 
cyclones larger than 155 megawatts of electricity ("MWe"); 0.84 
lb/mmBtu for wet bottom boilers larger than 65 MWe; and 0.80 
lb/mmBtu for vertically fired boilers. EPA determined that each of 
these limits would be achievable by 85 to 90 percent of the 
applicable boiler population. 61 Fed. Reg. at 67,113-14.

 14 Appalachian Power appended five exhibits to its reply brief 
that it asserts buttress arguments made in its opening brief. Four 
of the exhibits appear to consist of manipulations of EPA's statisti-
cal models prepared by Appalachian Power's consultant at least 
four months after the final rule was issued. Because these exhibits 
were never submitted to EPA, they are excluded from the record 
for judicial review. See 42 U.S.C. s 7607(d)(7)(A) (1994); American 
Petroleum Inst. v. Costle, 609 F.2d 20, 22 (D.C. Cir. 1979). Appala-
chian Power contends that the exhibits could not have been submit-
ted during the rulemaking because EPA did not disclose its meth-
odology early enough in the process. Even if this were true, under 
such circumstances the statute requires that the materials first be 
raised with the agency through a petition for reconsideration. See 
42 U.S.C. s 7607(d)(7)(B) (1994); American Petroleum Inst. v. 
Costle, 665 F.2d 1176, 1191 (D.C. Cir. 1981) (quoting H.R. Rep. No. 
95-294, at 323 (1977)) (" '[T]he Agency must first be given an 
opportunity to pass on the significance of the materials and deter-
mine whether supplementary proceeding[s] are called for or not.' "). 
The virtue of this requirement is readily apparent in this case: 
Because the four documents were appended to a reply brief with 
virtually no explication and without opportunity for agency re-
sponse, we are unable to evaluate their accuracy or significance. A 
fifth document appended to Appalachian Power's reply brief is a 
Department of Energy memorandum commenting on a draft of 


 II. Discussion

 A. The Group 1, Phase II Emission Limits

 Appalachian Power's first challenge is to EPA's statutory 
authority to revise the Group 1 emission limits, which is 
bounded by the requirement that the agency must determine 
that "more effective low NOx burner technology is available." 
See 42 U.S.C. s 7651f(b)(2). EPA argues that a plain reading 
of this language reveals that it may revise the Group 1 
emission limits if performance data show that available tech-
nology can achieve lower emission limits. It contends that 
because Congress required the agency to evaluate the capa-
bilities of low NOx burner technology when setting the initial 
Group 1 limits, Congress must have intended that EPA would 
reevaluate those capabilities in deciding whether to revise 
those limits. Appalachian Power argues, however, that "more 
effective" technology refers to a change in burner design and 
not merely to a proven increase in the effectiveness of 
existing burners. Because EPA has not provided evidence 
that "more effective" burners than those justifying the April 
1995 limits exist, Appalachian Power argues, the revised rates 
must be vacated as contrary to the statute.

 Because resolution of this question turns on the interpreta-
tion of the statutory phrase "more effective low NOx burner 
technology," the two-step Chevron framework governs our 
analysis. Under Chevron, we must first consider, having 
studied the statutory text and the legislative history, "wheth-
er Congress has directly spoken to the precise question at 
issue. If the intent of Congress is clear, that is the end of the 
matter; for the court, as well as the agency, must give effect 

__________
EPA's final rule. As the statute makes clear, such interagency 
comments are not part of the record for judicial review. See 42 
U.S.C. s 7607(d)(7)(A); Sierra Club v. Costle, 657 F.2d 298, 404 
n.519 (D.C. Cir. 1981). Accordingly, we grant EPA's motion to 
strike the five exhibits.

 Appalachian Power's challenge to the rule's NOx allowance pro-
gram, see 40 C.F.R. s 76.16 (1997), has been mooted by our 
granting of EPA's motion to vacate and remand this portion of the 
rule.


to the unambiguously expressed intent of Congress." Chev-
ron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 
467 U.S. 837, 842-43 (1984); see also Ohio v. United States 
Dep't of the Interior, 880 F.2d 432, 441 (D.C. Cir. 1989). If 
Congress has not directly addressed the precise question at 
issue, "the question for the court is whether the agency's 
answer is based on a permissible construction of the statute," 
Chevron, 467 U.S. at 843--that is, whether it is "reasonable in 
light of the Act's text, legislative history, and purpose." 
Southern Calif. Edison Co. v. FERC, 116 F.3d 507, 511 (D.C. 
Cir. 1997).

 Chevron's first step does not take us very far. There is 
nothing in the statutory section at issue or in the legislative 
history to suggest what Congress meant by "more effective 
low NOx burner technology" or, more specifically, whether 
the phrase can encompass varied applications of existing 
controls as well as new controls. The word "technology," for 
example, is a chameleon word, capable of many meanings, but 
here even its context does not help us to identify a precise 
meaning. Elsewhere in the Act, "technology" is defined as 
comprising "methods, systems, and techniques," which lends 
support to EPA's interpretation, see, e.g., 42 U.S.C. s 7479(3) 
(1994) (defining "best available control technology" as an 
emission limitation achievable through "application of produc-
tion processes and available methods, systems, and tech-
niques"), but this single reference cannot suffice to determine 
Congress's intent with respect to low NOx burners.

 The legislative history also provides few clues as to the 
breadth of the phrase. Although the 1990 amendments to the 
Act were ultimately the product of a conference committee, 
the language in section 407(b)(2) was derived largely from the 
Senate bill. During debate on the bill, several senators 
referred to "low NOx burner technology" as the standard by 
which other emission control methods would be judged, but 
none of these senators elaborated on what the phrase includ-
ed. See, e.g., 136 Cong. Rec. 35,627 (1990) (statement of Sen. 
Cochran) ("[U]tilities will be allowed to comply with nitrogen 
oxide reduction requirements through the application of low-
NOx burner technology. This technology is a reasonable, 


cost-effective method which has proven to be successful in 
achieving significant NOx reductions."); 136 Cong. Rec. 5046 
(1990) (statement of Sen. Lott) (emission rates are based on 
"the application of low-NOx burner technology, a much more 
reasonable and cost-effective method proven to successfully 
achieve significant NOx reductions"). Similarly, the confer-
ence report accompanying the final version of the bill notes 
simply that "[t]he NOx reductions from existing units mandat-
ed under section 407 are to be accomplished by use of 
conventional, available burner technology ('low-NOx' burn-
ers)," H.R. Conf. Rep. No. 101-952, at 344 (1990), a declaration 
that does not aid us in divining whether the phrase "more 
effective low NOx burner technology" implies a change in 
burner.

 Because our search for Congress's intent has been less 
than fruitful, we go on to decide, under the second step of the 
Chevron analysis, whether EPA's interpretation of the phrase 
"more effective low NOx burner technology" to encompass 
improved performance of existing burners is reasonable. We 
believe that it is. As we have noted, it is evident that 
Congress intended that low NOx burner technology serve as a 
benchmark for emission limits promulgated under Title IV, so 
to the extent that the rule derived from EPA's interpretation 
does not require technology beyond low NOx burners, that 
rule would not be inconsistent with the intent of the statute. 
EPA's interpretation is also consistent with the concern with 
achievability that motivates the section. See, e.g., 42 U.S.C. 
s 7651f(b)(1) (EPA may set higher emission limits than those 
provided by statute if statutory rates are not achievable); id. 
s 7651f(b)(2) (Group 2 emission limits must be based on 
achievable degree of reduction). In other words, it is a fair 
interpretation to read Congress's directive that more effective 
technology be available as authorizing more stringent limits 
only if those limits are achievable in practice. Moreover, the 
fact that Congress did not simply require a determination 
that "more effective low NOx burners" existed suggests that 
"more effective low NOx burner technology" refers to some-
thing beyond the burner hardware itself. If this were not the 
case, we would expect to find some evidence to the contrary 


in the legislative history; we find none, and Appalachian 
Power is unable to point us toward any.

 We addressed a similar issue with respect to the Clean Air 
Act in International Harvester Co. v. Ruckelshaus, 478 F.2d 
615 (D.C. Cir. 1973). At issue was a provision of the Act that 
authorized a one-year exemption from an emission-level re-
quirement if, inter alia, "the applicant has established that 
effective control technology, processes, operating methods, or 
other alternatives are not available." Id. at 624 (quoting 42 
U.S.C. s 1857f-1(b)(5)(D)(iii) (1970)). We rejected the peti-
tioners' argument that EPA's determination of whether tech-
nology was "available" must be based solely on "technology in 
being as of the time of the application." Rather, we held that 
EPA was justified in determining what technology would be 
considered "available" based on predicted improvements in 
existing technology, "subject to the restraints of reasonable-
ness." Id. at 628-29. See also Portland Cement Ass'n v. 
Ruckelshaus, 486 F.2d 375, 391-92 (D.C. Cir. 1973) (in deter-
mining "achievable" emission limits, EPA may make reason-
able projection based on existing technology). We can find 
no significant difference between a determination that "avail-
able" technology includes predicted improvements in existing 
technology and a determination that "more effective" technol-
ogy includes actual improved performance in existing technol-
ogy. We thus think it reasonable, as a preliminary matter, 
for EPA to find that "more effective low NOx burner technol-
ogy" exists if improved performance for already-existing 
burners can be shown.

 Appalachian Power next argues that even if "more effective 
low NOx burner technology" is given the meaning we approve 
today, EPA has failed to show that boiler performance has 
improved. EPA asserts that its regression analysis shows 
that boilers retrofitted with low NOx burners can achieve 
lower emission levels than the limits deemed adequate by the 
1995 rule. This improvement in performance, EPA contends, 
may be attributable to a number of improvements in the 
effectiveness of the technology surrounding low NOx burners, 
including the accumulated experience of boiler operators, 
improved operating practices, more advanced burner tuning 


and management software, and improved automation. Appa-
lachian Power challenges this conclusion, arguing that the 
revised limits set by the rule require technology beyond the 
capability of low NOx burners. Because Appalachian Power's 
challenge, although framed in the most general of terms, is at 
root a challenge to EPA's analytical model, we must consider 
whether the use of that model was arbitrary and capricious. 
See 42 U.S.C. s 7607(d)(9) (1994) (authorizing reversal of 
actions under the Act found to be "arbitrary, capricious, an 
abuse of discretion, or otherwise not in accordance with law"). 
Our analysis is guided by the deference traditionally given to 
agency expertise, particularly when dealing with a statutory 
scheme as unwieldy and science-driven as the Clean Air Act. 
As we have previously noted, so long as EPA "acted within its 
delegated statutory authority, considered all of the relevant 
factors, and demonstrated a reasonable connection between 
the facts on the record and its decision," we will not interfere 
with its conclusion. Ethyl Corp. v. EPA, 51 F.3d 1053, 1064 
(D.C. Cir. 1995).

 Statistical analysis is perhaps the prime example of those 
areas of technical wilderness into which judicial expeditions 
are best limited to ascertaining the lay of the land. Although 
computer models are "a useful and often essential tool for 
performing the Herculean labors Congress imposed on EPA 
in the Clean Air Act," Sierra Club, 657 F.2d at 332, their 
scientific nature does not easily lend itself to judicial review. 
Our consideration of EPA's use of a regression analysis in 
this case must therefore comport with the deference tradi-
tionally given to an agency when reviewing a scientific analy-
sis within its area of expertise without abdicating our duty to 
ensure that the application of this model was not arbitrary. 
As we have noted, it is only when the model bears no rational 
relationship to the characteristics of the data to which it is 
applied that we will hold that the use of the model was 
arbitrary and capricious. See American Iron & Steel Inst. v. 
EPA, 115 F.3d 979, 1005 (D.C. Cir. 1997); Chemical Mfrs. 
Ass'n v. EPA, 28 F.3d 1259, 1265 (D.C. Cir. 1994). There-
fore, while we will examine each step of EPA's analysis to 
satisfy ourselves that the agency has not departed from a 


rational course, we will not take it upon ourselves, as nonsta-
tisticians, to perform our own statistical analysis--a job more 
properly left to the agency to which it was delegated.

 EPA's determination of the revised Group 1 emission rates 
involved four steps: (1) the construction of a database consist-
ing of Group 1, Phase I boilers already employing low NOx 
burner technology; (2) the derivation of two equations (one 
each for tangentially fired boilers and wall-fired boilers) that 
captured the percent reduction in emissions from the uncon-
trolled emission rates achieved by the boilers in the database; 
(3) the application of these equations to the uncontrolled 
emission rates of Group 1, Phase II boilers; and (4) the 
setting of emission rates for Group 1, Phase II boilers based 
on the range of data resulting from the application of the 
equations. We examine each of these steps in turn.

 1. Construction of the Database

 EPA began its determination of whether the Group 1 limits 
should be revised by constructing a computerized database 
consisting of all known boilers that had installed only low NOx 
burners 15 subsequent to November 15, 1990 (the date the 
amendments to the Act were enacted),16 and for which there 
existed at least 52 days of data measured by continuous 
emission monitors ("CEMs").17 This database consisted ini-

__________
 15 Our ruling in Alabama Power prevented EPA from interpret-
ing "low NOx burner technology" as constituting any control meth-
od in addition to low NOx burners.

 16 EPA considered only post-1990 retrofits because it believed 
that Congress implicitly incorporated the then-current state of 
burner technology into the Act's amendments. See 61 Fed. Reg. at 
1443. Appalachian Power does not challenge this conclusion.

 17 A CEM is used "to sample, analyze, measure, and provide, by 
readings taken at least once every 15 minutes, a permanent record 
of emissions, expressed in pounds per hour (lb/hr) for sulfur dioxide 
and in pounds per million British thermal units (lb/mmBtu) for 
nitrogen oxides." 40 C.F.R. s 72.2 (1997). Both EPA and industry 
commenters believed that 52 days constituted the minimum number 
of days of data needed for a valid analysis. See 61 Fed. Reg. at 
67,124.


tially of 24 wall-fired boilers and 9 tangentially fired boilers. 
61 Fed. Reg. at 67,121. In response to the recommendations 
of several commenters that various boilers be included in or 
excluded from this database, EPA formalized and expanded 
its selection criteria into Data Quality Objectives ("DQOs")--
"rigorous and precisely defined rule tables" used to select 
candidates for the database. Id. at 67,122. Application of 
the DQOs resulted in a new database consisting of 39 wall-
fired boilers and 14 tangentially fired boilers, a result that 
EPA believed would "increase[ ] the overall representative-
ness of the database." Id. at 67,123-24.

 EPA then considered the lowest average NOx emission rate 
each boiler in the database had sustained for at least 52 days 
when CEM data were available (the "low NOx period"). To 
take into account the fact that the emissions rate immediately 
after low NOx burner installation might not be representative 
of a boiler's emissions rate at full operating capacity, EPA 
also analyzed emission rates for a time period beginning 30 
days after resumption of operation after installation until the 
end of the available CEM data as well as for a time period 
beginning with the first hour of the low NOx period until the 
end of the available CEM data. Id. at 67,125.18 In response 
to comments that suggested that the 52-day period alone was 
insufficient to determine actual emission rates, EPA selected 
for the final rule the time period beginning with the first hour 
of the low NOx period until the end of the available CEM data 
(the "post-optimization period") as the basis for assessing low 
NOx burner performance.19 Id. at 67,126.

__________
 18 EPA also developed "load-weighted annual average NOx emis-
sion rates" to take into account the fact that the low NOx period 
may not adequately capture seasonal variations in demand for 
power and found these rates to be "essentially the same as or lower 
than" the average emission rates for the low NOx period. 61 Fed. 
Reg. at 67,125.

 19 Appalachian Power's argument that EPA unreasonably limited 
its analysis to the 52-day period is thus unfounded. In any event, 
the use of the post-optimization period seems eminently rational 


 As part of its procedural challenge to the rule, Appalachian 
Power argues that EPA violated the rulemaking require-
ments of the Act by not disclosing the DQOs until the final 
rule, apparently invoking the Act's requirement that EPA's 
notice of proposed rulemaking ("NPRM") include, inter alia, 
"the methodology used in obtaining the data." 42 U.S.C. 
s 7607(d)(3)(B) (1994). We disagree. While it is true that 
the DQOs did not appear in the NPRM in precisely the same 
form or to the same extent as they did in the final rule, it is 
not the case that any significant DQO appeared for the first 
time in the final rule. In the NPRM, EPA listed two criteria 
that governed selection of boilers for the database: (1) wheth-
er units had installed only low NOx burners and had installed 
them after the date of enactment of the 1990 amendments 
and (2) whether post-retrofit hourly emission rate data, mea-
sured by CEMs and sustained for at least a 52-day period, 
was available. 61 Fed. Reg. at 1443-44. The DQOs in the 
final rule include these criteria as well as the following: (1) 
the database would be limited to Group 1 boilers; (2) boilers 
for which low NOx burner design, installation, and/or opera-
tions were known to be seriously flawed would be excluded; 
(3) boilers would have to have a pre-retrofit uncontrolled 
emission rate based on quality-assured data; (4) New Source 
Performance Standards boilers 20 or boilers using Powder 
River Basin coal would be excluded because they could more 
easily meet low NOx emission limits than other boilers. 61 
Fed. Reg. at 67,122 (Table 3). With the exception of criterion 
(1), which merely defines the database, the DQOs that ap-
peared explicitly for the first time in the final rule were all 
intended to exclude faulty or overly optimistic data. Appala-

__________
given the alternatives: Using solely the 52-day period would, as 
Appalachian Power argues, rely on too little data, and using the 
entire post-retrofit period after the 30-day break-in period would 
give inordinate weight to data arising from a time when a boiler was 
not operating at its optimal performance level.

 20 New Source Performance Standard boilers are new coal-fired 
utility boilers on which construction began after August 17, 1971, 
and which are subject to the New Source Performance Standards 
contained in 40 C.F.R. pt. 60. 61 Fed. Reg. at 67,121.


chian Power does not and, we think, could not contend that it 
would have challenged these quality-control DQOs had they 
been presented in full in the proposed rule. There is there-
fore no basis for us to conclude, as we must to invalidate the 
rule for procedural errors, that the addition of these DQOs in 
the final rule was "so serious and related to matters of such 
central relevance to the rule that there is a substantial 
likelihood that the rule would have been significantly changed 
if such errors had not been made." 42 U.S.C. s 7607(d)(8) 
(1994). By including all the database criteria in the NPRM 
that could possibly have been subject to adverse comment, 
EPA has complied with its statutory directive to include "the 
methodology used in obtaining the data."

 Moreover, we can find no apparent defects in the database 
itself. In constructing the database for the final rule, EPA 
applied the DQOs not only to those boilers used in the 
proposed rule analysis but also to those boilers that commen-
ters requested that EPA consider as well as to additional 
boilers identified by EPA as using low NOx burner technolo-
gy. This resulted in the addition of 20 boilers to the database 
(which ultimately contained a total of 39 wall-fired boilers and 
14 tangentially fired boilers 21). 61 Fed. Reg. at 67,123-24. 
In this respect, EPA has identified all likely candidates for 
the boiler database as well as been responsive to comments.22 
Appalachian Power's assertion that the emission rates reflect 

__________
 21 Although the relatively small number of tangentially fired 
boilers might be cause for looking more closely at the regression 
analysis for this subgroup, see Daniel L. Rubinfeld, Reference Guide 
on Multiple Regression, in Reference Manual on Scientific 
Evidence 415, 454 (1994) (noting that 30 data points are typically 
seen as sufficient for regressions with a small number of explanato-
ry variables), Appalachian Power has not controverted EPA's asser-
tion that the database is representative of the entire boiler popula-
tion.

 22 We therefore reject Appalachian Power's assertion that EPA's 
enlargement of the database post-proposal constituted a procedural 
violation. As we noted in International Harvester, 478 F.2d at 632 
n.51, it would be unproductive to insist that an agency "learn from 
the comments on its proposals only at the peril of starting a new 


boilers employing beyond-burner technology is not supported 
by the record.

 2. Construction of the Equations

 Using the database, EPA constructed two linear regression 
equations, one for wall-fired boilers and one for tangentially 
fired boilers, that captured the percent reduction in emissions 
with low NOx burner technology as a function of the uncon-
trolled emission rate. As EPA noted in the preamble to the 
final rule, the use of a regression model rather than a simple 
extrapolation from the low NOx burner database would enable 
EPA better to predict the effect of installing low NOx burner 
technology on Phase II boilers. See 61 Fed. Reg. at 67,130.

 It is commonly understood that the more variables that are 
included in a regression analysis, the more likely it is that the 
model describes accurately the phenomenon it is being used 
to explain.23 As the Supreme Court has noted in the employ-
ment discrimination context, "the omission of variables from a 
regression analysis may render the analysis less probative 
than it otherwise might be," but it does not render the 
analysis completely devoid of value. Bazemore v. Friday, 478 
U.S. 385, 400 (1986). Nevertheless, a number of commenters, 
Appalachian Power among them, argued that EPA's analysis 
failed to take into account several operational factors associat-
ed with low NOx burners, including normal aging and wear of 

__________
procedural round of commentary." So long as the final rule pro-
mulgated by the agency is a "logical outgrowth" of the proposed 
rule--that is, if "the purposes of notice and comment have been 
adequately served," Fertilizer Inst. v. EPA, 935 F.2d 1303, 1311 
(D.C. Cir. 1991)--we will find no procedural violation. EPA's action 
between proposal and promulgation, which served only to bolster 
the validity of the model by increasing the amount of data upon 
which it was based, certainly satisfies this standard.

 23 Cf. National Lime Ass'n v. EPA, 627 F.2d 416, 431 n.46 (D.C. 
Cir. 1980): "[T]o be achievable, we think a uniform standard must 
be capable of being met under most adverse conditions which can 
reasonably be expected to recur and which are not or cannot be 
taken into account in determining the 'costs' of compliance."


equipment, increased particulate emissions, auxiliary equip-
ment design, and furnace configuration, all of which arguably 
could have an effect on the level of NOx emissions. EPA 
responded to this concern by using the post-optimization 
period rather than the 52-day period for analysis, which it 
believed would "reasonably account for variation in operating 
conditions among Group 1 boilers." EPA Response to Com-
ments at 63.24 "The claim that there are various problems 
due to aging of equipment that have not yet been encoun-
tered," the agency continued, "is speculative and unsupport-
ed." Id.

 While EPA's response could have been more extensive, it 
does not suggest that the agency's use of the regression 
models was arbitrary and capricious. As we have previously 
noted, the party challenging the use of such a model "cannot 
undermine a regression analysis simply by pointing to varia-
bles not taken into account that might conceivably have pulled 
the analysis's sting." Koger v. Reno, 98 F.3d 631, 637 (D.C. 
Cir. 1996) (dicta). See also Segar v. Smith, 738 F.2d 1249, 
1277 (D.C. Cir. 1984) (noting that where there is no reason to 
conclude that the omitted variable correlates with the depen-
dent variable, the omission will not affect the validity of the 
analysis). Rather, that party must identify clearly major 
variables the omission of which renders the analysis suspect. 
This conclusion, derived from employment discrimination 
cases, holds equally true in this context, even more so be-
cause of the deference due to an agency's scientific analysis. 
Neither the commenters before EPA nor Appalachian Power 
here before us has offered any data to support the assertion 
that additional factors not accounted for in EPA's regression 
analysis would have a significant effect on NOx emissions. 
The regression equations were constructed based on the data 
available or reasonably predictable at the time of the final 
rule; to require EPA to take into account variables for which 

__________
 24 This document, containing EPA's responses to comments sub-
mitted during the rulemaking process, was incorporated by refer-
ence in the preamble to the final rule. See 61 Fed. Reg. at 67,120.


no data existed would be to require that it engage in precisely 
the type of arbitrary rulemaking the Act forbids.

 3. Application of the Equations to the Uncontrolled 
 Emission Rates of Phase II Boilers

 The next step of EPA's analysis was to calculate, through 
the application of the regression equations developed to the 
uncontrolled rates of the Phase II boilers,25 the NOx emission 
rate each Phase II boiler could be expected to achieve 
through a low NOx burner retrofit. Appalachian Power's 
primary challenge to this step of the analysis is that the 
results generated by the regression equation are faulty be-
cause they do not include the uncertainty inherent in the 
calculation--in other words, the true reduction in NOx emis-
sions associated with a particular retrofit might be somewhat 
greater than or less than the amount yielded by the regres-
sion equation. As a result, Appalachian Power contends, 
because EPA based its revised emission limits on what repre-
sents the midpoint between the uncertainty boundaries, the 
predicted emission levels are based on levels achievable by 
only 50 percent of the Phase II boilers.

 Although Appalachian Power's assertion that the results 
are subject to some uncertainty is correct, we do not believe 
its complaint constitutes a telling critique of EPA's analysis. 
In any regression analysis, the line described by the regres-
sion equation represents the best possible fit to the data; 
some points will necessarily be plotted above the line and 
some will fall below the line (except in the rare circumstance 
in which the line is a perfect fit to the data). While each data 
point will be associated with some residual (the difference 

__________
 25 EPA noted in the preamble to the proposed rule that the Group 
1, Phase II database of uncontrolled emission rates contained 
information for only 69 percent of the Phase II population. 61 Fed. 
Reg. at 1449. While a more complete database would have been 
preferable, EPA determined by comparison of boiler size and age 
that the Phase II database "adequately represents the entire Phase 
II population." Id. Appalachian Power has not suggested that this 
is not the case.


between actual and fitted values), so long as this residual is 
within acceptable statistical limits, the fact that some data 
points necessarily fall below the line does not render the 
regression analysis invalid. As we have noted in similar 
circumstances, "[t]hat the model does not fit every application 
perfectly is no criticism; a model is meant to simplify reality 
in order to make it tractable." Chemical Mfrs., 28 F.3d at 
1264. To invalidate a model simply because it does not 
perfectly fit every data point "would be to defeat the purpose 
of using a model." Id. at 1265. Appalachian Power does not 
suggest in its argument before us that the uncertainty sur-
rounding the data points is statistically unacceptable, only 
that it exists.26 We would not deem that sufficient to label 
EPA's model arbitrary and capricious.

 This is not, certainly, like the case in Sierra Club, in which 
we rejected a 92 percent sulfur removal rate that was based 
solely on evidence that "only one commercial scale plant and 
one small pilot unit can almost but not quite meet the 
standard." 657 F.2d at 363. In this case, 23 of 39 wall-fired 
boilers and 9 of 14 tangentially fired boilers in Group 1, Phase 
I can currently meet the revised limits. 61 Fed. Reg. at 
67,123-24 (Tables 4 and 5). Because the statute requires only 
a determination that more effective low NOx burner technolo-
gy is "available" for a class of boilers, the fact that, as 

__________
 26 One way to assess the "fit" of a particular model is by its R2 
value. R2 is a measure of the percentage of variation in the 
dependent variable that is accounted for by the explanatory varia-
bles--here, the degree of reduction in emissions explained by the 
installation of low NOx burners. The range of values for R2 is 
between 0 and 1; the closer R2 is to 1, the more the change in the 
dependent variable is explained by the explanatory variables. 
Chemical Mfrs. Ass'n v. EPA, 870 F.2d. 177, 215 n.139 (5th Cir. 
1989). The R2 value for the wall-fired boiler equation was 0.731, 
while the R2 value for the tangentially fired boiler equation was 
0.707. 61 Fed. Reg. at 67,133. While "[a]s a general rule, courts 
should be reluctant to rely solely on a statistic such as R2 to choose 
one model over another," Rubinfeld, supra, at 457; see also Segar, 
738 F.2d at 1282 n.27, it cannot be said from these values that 


Appalachian Power claims, some individual boilers cannot 
currently meet the revised limits does not serve to invalidate 
the rule.

 4. Determination of the Limitation

 Finally, EPA used the rates resulting from the regression 
equations to determine "reasonably achievable emission limi-
tation[s]" 27 for Phase II boilers. 61 Fed. Reg. at 67,130. 
Appalachian Power asserts, however, that the predicted con-
trolled emission rates of many boilers are so close to the 
emissions limits that any error in the prediction would render 
these boilers in violation of the limits. In addition, it claims 
that many utilities typically attempt to overcontrol emissions 
so that any fine tuning of the boiler will not bring the boiler 
over the emission limit. If the rule deems this "overcon-
trolled" emissions level achievable, Appalachian Power claims, 
utilities will be penalized for anticipating control difficulties. 
For both these reasons, Appalachian Power argues that EPA 
should have included a compliance margin in the NOx emis-
sion limits.

 Again, we find this challenge insufficient to vacate the rule. 
The first reason that this is so is a statutory one: The Act 
permits EPA to revise the emissions limitations upon a 
finding that "more effective low NOx burner technology is 
available." 42 U.S.C. s 7651f(b)(2). The fact that these 
boilers can achieve lower emission levels with low NOx burner 
technology--even if they depend on a cushion between those 
levels and the emissions limits--demonstrates that the statu-
tory requirement has been satisfied. Moreover, as EPA has 
noted in the preamble to the final rule, boiler owners who 
fear that tuning may send them over the allowable limits may 
use the alternative emission limitations ("AEL") and averag-
ing options provided in the Act to ensure that their total NOx 
emissions from all affected units comply with EPA regula-

__________
EPA's use of this statistical model represented unreasoned deci-
sionmaking.

 27 EPA defined a "reasonably achievable" limit as one that could 
be met by 85 to 90 percent of the relevant boiler population. 61 
Fed. Reg. at 67,136.


tions.28 61 Fed. Reg. at 67,136. Finally, we note, as EPA 
has pointed out, that the limit applies to a unit's average 
annual emission rate rather than to a monthly or a daily 
emission rate. This means that a boiler may overemit on 
some days and underemit on others and still be deemed in 
compliance with its emission limit. Given these various op-
tions, there is no reason that EPA's failure to build a compli-
ance margin into the limits themselves should render them 
arbitrary and capricious. We therefore reject Appalachian 
Power's challenge on this front, as with its other substantive 
challenges to the Group 1, Phase II limits.

 Undaunted, Appalachian Power and intervenor National 
Mining Association ("NMA") mount an additional procedural 
challenge to the Group 1, Phase II limits: namely, that EPA 
justified its revision of the rates based on public health and 
welfare concerns not authorized in the statute.29 See 61 Fed. 
Reg. at 67,160-61. We do not find this argument persuasive. 
The statute provides that EPA "may revise" (emphasis add-
ed) the limitations if it determines that more effective tech-
nology is available. We have noted that when a statute uses 
the permissive "may" rather than the mandatory "shall," "this 
choice of language suggests that Congress intends to confer 
some discretion on the agency, and that courts should accord-
ingly show deference to the agency's determination. Howev-
er, such language does not mean the matter is committed 

__________
 28 Under the AEL provision, EPA may authorize an emission 
limitation less stringent than that promulgated if it determines that 
a particular boiler cannot meet the applicable limitation despite the 
installation and proper operation of the appropriate control technol-
ogy. See 42 U.S.C. s 7651f(d) (1994). Under the emissions averag-
ing provision, the owner or operator of two or more affected units 
may petition to have the emission rates for those units averaged in 
order to meet the emissions limit. See 42 U.S.C. s 7651f(e) (1994).

 29 In an attempt to present evidence of the ongoing debate over 
whether environmental concerns warrant more stringent limits, 
NMA appended several items to its brief that were not before EPA 
during the rulemaking process. Because these items are not part 
of the record on review, see 42 U.S.C. s 7607(d)(7)(A), we grant 
EPA's motion to strike the attachments.


exclusively to agency discretion." Dickson v. Secretary of 
Defense, 68 F.3d 1396, 1401 (D.C. Cir. 1995) (emphases in 
original). Here, it is clear that EPA's discretion is not 
boundless because section 407(b)(2) requires that EPA deter-
mine that more effective low NOx burner technology is avail-
able before it is permitted to revise the Group 1 emission 
limits. There is no indication, however, that Congress intend-
ed to further limit EPA's discretion to revise the Group 1 
limits once such a determination has been made. Our conclu-
sion is supported by the fact that section 407(b)(2) provides 
that EPA "shall" establish the Group 2 emission limits by 
January 1, 1997, but "may" revise the Group 1 limits by the 
same date. See 42 U.S.C. s 7651f(b)(2). The use of both 
words in the same statutory subsection--as well as the sec-
tion's further reference to the applicability of "the revised 
emission limitations, if any" (emphasis added)--implies that 
Congress intended that EPA's discretion to revise the Group 
1 limits be broader than its discretion to set the Group 2 
limits.

 Ethyl Corp., relied on by Appalachian Power, is not to the 
contrary. In Ethyl Corp., we considered a statute that 
provided that EPA, " 'upon application of any manufacturer of 
any fuel or fuel additive, may waive' " a prohibition against 
introducing certain fuel additives into commerce upon a find-
ing that "the fuel additive does not cause or contribute to a 
failure of vehicles to meet emission standards." 51 F.3d at 
1055, 1058 (quoting 42 U.S.C. s 7545f(4) (1988 & Supp. V 
1993)). The statute also provided that if EPA did not act 
either to grant or to deny a waiver application within 180 
days, the waiver would be treated as granted. See id. at 1059 
(quoting 42 U.S.C. s 7545(f)(4)) ("If the Administrator has 
not acted to grant or deny an application under this para-
graph within one hundred and eighty days of receipt of such 
application, the waiver authorized by this paragraph shall be 
treated as granted."). EPA found that Ethyl had established 
the factual finding but denied its waiver application for public 
health reasons. We held that in the context of the entire 
statute, the statutory language stating that EPA "may waive" 
the prohibition after making the requisite factual determina-


tion referred to EPA's discretion "to either act affirmatively, 
granting or denying a waiver, or not to act, and instead, to let 
the 180-day limit run." Id. As a result, we held that once 
the factual standard was met, EPA's discretion extended only 
to the decision as to whether the waiver would occur through 
EPA's action or EPA's inaction. Here, by contrast, there is 
no statutory language that provides a more limited definition 
of the phrase "may revise." There is not, as in Ethyl Corp., a 
provision that once the requisite factual finding is made, the 
Group 1 limits will be revised even if EPA chooses not to act 
affirmatively to do so. Section 407(b)(2) states simply that 
EPA "may revise" the Group 1 emission limits downward if it 
determines that more effective low NOx burner technology is 
available, limited only by the provision that the new emission 
limits, "if any," will not apply to boilers already regulated in 
Phase I. Given the lack of alternative interpretations, we 
cannot conclude that the word "may" has the same effect as it 
did in Ethyl Corp., that is, that it gives EPA discretion only 
to choose the avenue by which revised emission limits will be 
promulgated. Rather, we believe that "may revise" refers to 
EPA's discretion to revise the Group 1 limits at all even after 
the requisite finding on more effective low NOx burner tech-
nology has been made. For EPA to justify this decision in 
part by referring to the environmental concerns of the Act, 
see 61 Fed. Reg. at 67,119-20; EPA Response to Comments 
at 281, was not arbitrary and capricious--indeed, it would 
have been arbitrary for EPA to offer no justification, and 
Appalachian Power has not suggested other considerations 
that would have been more consonant with the statutory 
framework.30

__________
 30 In fact, it is difficult to see how Appalachian Power has been 
injured by EPA's consideration of public health and welfare con-
cerns. EPA referred to these factors only in determining whether 
it should, in its discretion, impose the limits that it had already 
determined were justified under the statutory criterion. If EPA 
had believed that it could not take these considerations into account, 
the result would have been identical: EPA would have imposed the 
same limits Appalachian Power now challenges.


 In any event, it is clear, contrary to Appalachian Power's 
argument, that EPA has sufficiently justified its decision to 
revise the Group 1 emission limits apart from environmental 
concerns. Appalachian Power is correct that the burden is on 
EPA to justify the change from the 1995 emission limits, 
which the agency agreed were "aggressive," see 60 Fed. Reg. 
at 18,758-59, "[b]ut that justification need not consist of 
affirmative demonstration that the status quo is wrong; it 
may also consist of demonstration, on the basis of careful 
study, that there is no cause to believe that the status quo is 
right, so that the existing rule has no rational basis to support 
it." Center for Auto Safety v. Peck, 751 F.2d 1336, 1349 (D.C. 
Cir. 1985). As EPA has noted, the 1995 emission limits were 
based on data from periods only until 1992, while the current 
limits incorporated additional data from as recently as 1996. 
See 61 Fed. Reg. at 67,120; EPA Response to Comments at 
27-28. This increase in available data, and the more strin-
gent limits that analysis of that data generated, were suffi-
cient for EPA to conclude that "there is no cause to believe 
that the status quo [i.e., the 1995 emission limits] is right." 
Because we find nothing irrational in that determination, we 
uphold the revised Group 1 NOx emission limits.

 B. The Group 2 Emission Limits

 By contrast to the boilers in Group 1, the boilers in Group 2 
are not necessarily amenable to retrofitting with low NOx 
burners. For this reason, Congress did not require EPA to 
base its Group 2 emission limits on that single control tech-
nology. Instead, in section 407(b)(2), Congress instructed 
EPA to base the Group 2 emission rates on

 the degree of reduction achievable through the retrofit 
 application of the best system of continuous emission 
 reduction, taking into account available technology, costs 
 and energy and environmental impacts; and which is 
 comparable to the costs of nitrogen oxides controls set 
 [for Group 1 boilers].

42 U.S.C. s 7651f(b)(2). Appalachian Power challenges 
EPA's interpretation of this statutory language, an interpre-
tation that informed the methodology the agency used to set 


the Group 2 emission limits. In addition, even assuming the 
validity of that interpretation, Appalachian Power challenges 
the reasonableness of the methodology EPA employed. We 
reject both challenges.

 1. Statutory Interpretation of Section 407(b)(2)

 EPA believes that the statutory provision is ambiguous, 
both in its specific words and in their grammatical arrange-
ment. Although ambiguous, EPA concludes that the best 
reading of the key statutory phrase, "comparable to the costs 
of," directs it to conduct a comparison of the cost-
effectiveness of those control technologies available for Group 
2 boilers with the cost-effectiveness of the NOx controls 
required for Group 1 boilers (i.e., low NOx burner technolo-
gy). And it reasons that the provision as a whole instructs it 
to base the Group 2 limits on the degree of emissions 
reduction achievable by those Group 2 technologies that 
compare favorably in cost-effectiveness with low NOx burner 
technology. For these purposes, EPA measures cost-
effectiveness in dollars per ton of NOx removed ($/ton-
removed).31

 Appalachian Power, by contrast, argues that the language 
of the statutory provision is unambiguous. It contends that 
the language requires a comparison of the costs of producing 
electrical output using control technologies that can be used 

__________
 31 Appalachian Power charges that EPA's interpretation of "com-
parable cost" changed between April 1995 and its promulgation of 
the final rule at issue here. Appalachian Power notes that in April 
1995, EPA said that in selecting Group 2 controls it would "consider 
only those systems ... that ... are comparable in cost to the 
average cost in constant dollars of low NOx burner technology 
applied to Group 1 ... as determined in section 3 below." 60 Fed. 
Reg. at 18,776 (emphasis added). The charge of change-of-position 
is unfair, however, because the first sentence of the "section 3" 
referred to in the quotation uses the same measurement of compa-
rable cost EPA used in the final rule: "The Administrator will use 
the procedures ... specified in this section to estimate the average 
cost-effectiveness (in annualized $/ton NOx removed) of installed low 
NOx burner technology applied to Group 1, Phase I boilers." Id.


in Group 2 boilers with the costs of producing electrical 
output using low NOx burner technology in Group 1 boilers. 
Those costs, it argues, should be measured in dollars per 
kilowatt ($/kw) and dollars per kilowatt hour ($/kwh). In 
Appalachian Power's view, only those Group 2 technologies 
that compare favorably to low NOx burner technology by this 
measure may be considered in setting the Group 2 limits.

 Once again, Chevron's first step does not take us very far. 
The statute does not define the phrase "comparable to the 
costs of." As discussed below, we agree with EPA that the 
words in the phrase are ambiguous, see 61 Fed. Reg. at 
67,138, and that the provision as a whole is grammatically 
awkward, see id. at 67,139. And although the legislative 
history does not definitively address the meaning of the 
phrase, we also agree with EPA that that history is support-
ive of the agency's interpretation.

 To begin, both sides agree that the meaning of the word 
"cost" is the "price paid for a thing." App. Pwr. Br. at 33; 
EPA Br. at 34. Moreover, both agree that, depending upon 
the context, that "thing" could be either the amount of 
pollution removed ($/ton-removed) or the amount of electrici-
ty produced ($/kw or $/kwh). Indeed, the word "costs" is 
used in two places in section 407(b)(2), and perhaps the best 
evidence of the essential ambiguity of the word is that each 
side adopts the other's definition for one of the two uses. 
Appalachian Power argues that $/ton-removed is the appro-
priate way to define "costs" when they are "tak[en] into 
account" in determining "the best system of continuous emis-
sion reduction." App. Pwr. Br. at 32. It insists, however, 
that only $/kw and $/kwh will do for the key phrase, "compa-
rable to the costs of nitrogen oxides controls." Id. at 33; 
App. Pwr. Reply Br. at 8. EPA would use the two definitions 
in precisely the opposite places. See EPA Br. at 35.

 Turning to the grammatical structure of the statutory 
provision, Appalachian Power argues that its definition for 
the key phrase is "plainly" required because of the context in 
which the phrase is used. It contends that the antecedent of 
the word "which," in the phrase "which is comparable to the 


costs of nitrogen oxides controls," is the phrase "the best 
system of continuous emission reduction." On this reading, it 
argues that EPA's job is to base emission limits on "the best 
system of continuous emission reduction ... which is compa-
rable to the costs of nitrogen oxide controls." When compar-
ing the costs of one system of controls to those of another, it 
argues, the appropriate comparison is the cost of producing 
electrical power.

 Even if we were to adopt this view of the provision's 
grammar, it would be hard to conclude that Appalachian 
Power's definition is "plain." The syntax for which Appala-
chian Power argues simply does not resolve the question of 
"costs for what?" Although one certainly could compare the 
"costs" of two systems by comparing their costs for producing 
electrical output, one could also reasonably compare their 
costs for removing tons of pollution.

 Moreover, we cannot agree that Appalachian Power's view 
of the provision's grammar is the only reasonable one. As 
EPA notes, to read the phrase "best system" as the anteced-
ent of the word "which" would require deletion of both the 
semicolon and the word "and" that separate the two parts of 
the statutory provision. See 61 Fed. Reg. at 67,139. In 
EPA's view, the better reading is that the antecedent of 
"which" is the phrase "the degree of reduction achievable." 
On this reading, EPA urges, Congress contemplated that the 
agency would base Group 2 limits

 on the degree of reduction (1) which can be reached 
 through the best system of NOx reduction, taking into 
 account available technology, costs and energy and envi-
 ronmental impacts[;] and (2) which is "comparable to the 
 costs" of [low NOx burner] technology.

EPA Br. at 6 (emphases added). The only way to determine 
the degree of NOx reduction that can be achieved in Group 2 
boilers at costs comparable to the costs of low NOx burner 
technology, EPA argues, is to consider the relative costs of 
controls per ton of NOx removed. EPA contends that when 
one focuses on "degree of reduction" as the antecedent, 


rather than on "best system," cost-effectiveness becomes the 
natural measurement to apply.

 EPA's grammatical construction is plausible. But it is no 
more plausible than that of Appalachian Power because it, 
too, requires editing of the congressional text. This time, 
rather than make a deletion, we would need to make an 
addition. As noted in italics above, we would need to add the 
word "which," so that it appears twice rather than only once, 
in order to create a parallel construction that makes "the 
degree of reduction" the antecedent of both of the numbered 
phrases. The need to make that addition, however, only 
highlights its absence in the actual text and confirms the 
essential ambiguity of section 407(b)(2)'s key phrase.

 Finding nothing dispositive in the statute's language or 
grammar, we look next to the legislative history for guidance. 
Appalachian Power argues that EPA's construction is incon-
sistent with the purpose of section 407(b)(2), which, Appala-
chian Power contends, was to ensure that the dollar "cost of 
controls" to owners of Group 2 boilers would not exceed the 
dollar "cost of controls" imposed on owners of Group 1 
boilers--i.e., not exceed the cost of low NOx burners. We 
find little support in the legislative history, however, for 
Appalachian Power's view of the section's purpose. To the 
contrary, although we cannot say that the legislative history 
is dispositive, it does contain considerable support for EPA's 
view that cost-effectiveness is an appropriate measure of 
comparison, even if it is not the only appropriate measure.

 Appalachian Power correctly notes that the language of 
section 407(b)(2) that directs EPA to set Group 2 emission 
limits, including the key phrase "comparable to the costs of," 
comes from the Senate bill. Compare 42 U.S.C. 
s 7651f(b)(2), with Clean Air Act Amendments of 1990, 
S. 1630, 101st Cong. s 407(b)(2) (1990) (Senate bill), reprinted 
in Committee on Env't & Pub. Works, U.S. Senate, A Legisla-
tive History of the Clean Air Act Amendments of 1990, at 
4641 (1993) [hereinafter "Legislative History"]. By contrast, 
the House version of the bill prevented EPA from regulating 
certain Group 2 boilers unless EPA, inter alia, found meth-


ods "available for reducing emissions from such boilers that 
are as cost effective as the application of low nitrogen oxides 
burner technology in the case of [Group 1] boilers." Clean 
Air Act Amendments of 1990, S. 1630, 101st Cong. s 506(a)-
(c) (1990) (House bill) (emphasis added), reprinted in Legisla-
tive History, at 2277. Appalachian Power contends that the 
conference committee's adoption of the Senate version--
which did not use the phrase "cost effective" found in the 
House version--was tantamount to a rejection of the concept 
of cost-effectiveness. We disagree.

 As a general matter, courts often have noted the difficulty 
of determining the significance of Congress's unexplained 
modification of language in earlier drafts of legislation, and 
have found that such modification does not necessarily indi-
cate Congress's rejection of the substance of the earlier 
language. See, e.g., Seatrain Shipbuilding Corp. v. Shell Oil 
Co., 444 U.S. 572, 594-95 (1980); Edison Elec. Inst. v. EPA, 2 
F.3d 438, 451 (D.C. Cir. 1993). The two phrases at issue 
here--"comparable to the costs of" and "cost effective"--are 
not incompatible. It is possible that Congress regarded the 
two as synonymous, and that the conference committee sim-
ply adopted the Senate's formulation over that of the House.

 Elements of the legislative history of the enacted version 
support this reading. Perhaps most persuasive is Congress's 
direction, in the conference report on the final bill, that EPA 
should base emission limits for Group 2 boilers on "methods 
that are available for reducing emissions from such boilers 
that are as cost effective as the application of low nitrogen 
oxide burner technology to [Group 1] boilers." H.R. Conf. 
Rep. No. 101-952, at 344 (emphasis added). Moreover, the 
conference report incorporates a section of the Senate report 
on an earlier Senate bill. That report equated the phrase 
"cost-effectiveness"--as measured by $/ton-removed--with 
the phrase "comparable to the cost of":

 Also favoring the cost-effectiveness of [section 407] is the 
 development of new, lower-expense technologies.... 
 [The] decreasing cost for selective catalytic reduction 
 (SCR) may lower the expense of initial NOx reductions 
 even further. For example, SCR has long been viewed 
 as prohibitively expensive, but recent dramatic declines 


 in cost have brought the per-ton-removed price of this 
 technology down to as low as $600.... This is compara-
 ble to the cost of conventional control methods like low 
 NOx burners....

S. Rep. No. 101-228, at 332-33 (1989) (emphases added). The 
Senate report also noted that with the NOx emission limits, 
the Senate "intended to compel utilities to do no more than 
make the most cost-effective reductions." Id. at 332 (empha-
sis added).32

 Appalachian Power's general point, that Congress was con-
cerned that the "costs" for Group 2 boilers be comparable to 
the "costs" for Group 1 boilers, is plainly correct. But there 
is no support for Appalachian Power's contention that Con-
gress intended $/kwh to define the word in the second part of 
section 407(b)(2), while expecting $/ton-removed to define it in 
the first. Congress simply did not make the fine distinctions 
that the parties make here between different methods of 
measuring "costs." Indeed, when introducing the amend-
ment that led directly to section 407(b)(2), various Senators 
referred interchangeably to the terms "cost-effectiveness," 
"low cost," and "not unreasonably expensive." See, e.g., 136 
Cong. Rec. 5045 (1990) (statement of Sen. Chafee); 136 Cong. 
Rec. 5045-46 (1990) (statement of Sen. Baucus); 136 Cong. 
Rec. 5046 (1990) (statement of Sen. Lott). And during the 
floor debates on the conference report, Senator Burdick--
conferee and Chair of the Senate Committee on Environment 
and Public Works--again equated "cost" and "cost-effective," 
stating that the Group 2 limits were to be set

 only if the costs of such reductions are as cost effective 
 as reductions from installation of low NOx burners on 

__________
 32 Although Senate Report No. 101-228 used the phrase "compa-
rable to the cost of"--and used it synonymously with cost-
effectiveness--the version of the Senate bill that was the subject of 
this report did not itself contain the phrase. However, the confer-
ence committee report on the final bill, which did contain the 
phrase, stated that: "Section 407(b)(2) is intended to incorporate a 
portion of ... S. Report 101-228, that the NOx emission control 
technology requirements for [Group 2 boilers] are to reflect the 
relative difficulty of controlling NOx emissions from these boilers." 
H.R. Conf. Rep. No. 101-952, at 344. While it is not entirely clear 
which portion of the Senate report the conference committee in-


 other types of boilers.... This provision is carefully 
 worded to make cost considerations the determinative 
 factor in consideration of NOx reductions from [Group 2] 
 boilers.

136 Cong. Rec. 36,029 (1990) (statement of Sen. Burdick).

 In sum, we draw the same conclusion regarding the phrase 
"comparable to the costs of" in the 1990 amendments as the 
Supreme Court drew regarding the term "stationary source" 
in the 1977 amendments to the Act: neither the statutory 
language nor the legislative history is dispositive of the 
meaning of the term. See Chevron, 467 U.S. at 861-62.

 Moving then to Chevron's second step, we must consider 
whether EPA's decision to interpret the statute as contem-
plating a comparison of cost-effectiveness is reasonable. In 
light of the above discussion, there is little left to say. Given 
the ambiguous syntax and the multiple meanings that both 
parties concede may be assigned to the word "costs," we 
cannot conclude that EPA's decision to use $/ton-removed as 
the measurement of costs is unreasonable. Moreover, as our 
review of the legislative history suggests, although EPA's 
interpretation may not be required by that history, it surely 
is consistent with and supported by it. We thus conclude that 
EPA's construction of section 407(b)(2) is a permissible one.

 2. Challenges to EPA's Methodology for Determining 
 Emission Limits 33

 Having concluded that it would base Group 2 emission 
limits on the capabilities of those Group 2 control technologies 
comparable in cost-effectiveness to low NOx burner technolo-
gy, EPA developed a test for making such comparisons. 
EPA found that it could not rely on a comparison of median 
or mean costs alone, because the $/ton-removed cost for a 
given control technology, including low NOx burners, varied 
widely from boiler to boiler even within the same category of 
boiler, and had different cost ranges for different categories 

__________
tended to incorporate, Senate Report 101-228's entire discussion of 
the "Nitrogen Oxides Emission Reduction Program" spans less 
than two pages and includes the quotations set forth in the text.

 33 We discuss here only those elements of EPA's methodology 
relevant to the challenges made by Appalachian Power and interve-
nor NMA.


of boilers. See 61 Fed. Reg. at 67,138, 67,143 (Table 12). 
For this reason, EPA determined that it needed a more 
comprehensive statistical approach. See id. at 67,138.

 First, EPA excluded the cost-effectiveness figures for boil-
ers in the top and bottom 10 percent of cost-effectiveness, so 
that neither the lowest nor the highest cost projects would 
skew the comparison. See id. at 67,143 (Table 13); see also 
EPA Response to Comments at 91-92 (Joint Appendix 
("J.A.") 216-17).34 Next, EPA determined that the 
cost-effectiveness of using a given type of Group 2 control 
technology for a specific category of Group 2 boiler (a 
technology/category combination) was comparable to the 
cost-effectiveness of using low NOx burners in Group 1 boil-
ers, if the median $/ton-removed cost of that Group 2 
technology/category combination: (1) did not exceed by more 
than one-third the overall median $/ton-removed cost for low 
NOx burners in Group 1 boilers, and (2) did not exceed the 
individual medians for both of the categories of Group 1 
boilers.35 See id. at 67,138, 67,143. Finally, EPA required 

__________
 34 Appalachian Power asserts that EPA excluded only the high 
cost projects. The indicated record citations make clear that this 
assertion is incorrect.

 35 The effect of this latter prong was to require that the median 
$/ton-removed cost for any Group 2 technology/category combina-
tion not exceed the median $/ton-removed cost of whichever of the 
two Group 1 boiler categories had the higher median cost. See 61 
Fed. Reg. at 67,138; EPA Br. at 43 n.22. At various places, both 
EPA and Appalachian Power misstate this prong and its conse-
quences, effectively reading it as requiring that the median $/ton-
removed cost for any Group 2 technology/category combination not 
exceed the median for either category of Group 1 boilers--hence 
that it be less than the lower of the two categories. See 61 Fed. 
Reg. at 67,138; App. Pwr. Br. at 36, 39. EPA acknowledges its 
misstatement, but notes that it was not used in the calculation of 
the actual Group 2 emission limits. See EPA Br. at 43 n.22; 61 
Fed. Reg. at 67,143. Appalachian Power's misreading explains its 
incorrect contention that on the basis of EPA's own methodology 
the costs for two categories of Group 2 boilers (cyclones and wet 
bottom, wall-fired) are not comparable to the costs for Group 1.


that the 90th percentile of the $/ton-removed cost range for 
Group 2 technology/category combinations not exceed the 
90th percentile of the $/ton-removed cost range for low NOx 
burners in Group 1 boilers. See id. at 67,138.

 Using this cost-comparison test and further calculations, 
EPA selected appropriate control technologies and an emis-
sion limit for each of the four statutory categories of Group 2 
boilers, see 42 U.S.C. s 7651f(b)(2)(A)-(D) (wet bottom wall-
fired boilers; cyclones; units applying cell burner technology; 
and "all other types of utility boilers"). It concluded that it 
could not set emission limits at all for two types of boilers in 
the catch-all fourth category because no control technology 
met the comparability test. See id. at 67,114. And it con-
cluded that one kind of control technology was not cost-
effective for two types of boilers, and so could not be used in 
setting emission limits for those boilers. See id. at 67,143.

 Appalachian Power does not propose an alternative to the 
methodology EPA employed for setting the Group 2 emission 
limits. Instead, it and intervenor NMA charge that various 
elements of EPA's methodology are arbitrary and capricious, 
are unsupported by the record, or were used without follow-
ing the Act's procedural requirements, and that we therefore 
must overturn the emission limits generated by EPA's meth-
odology. Although we have considered and find all of peti-
tioners' and intervenor's myriad arguments in this area lack-
ing in merit, we discuss below only the more important of 
them.

 a. Significance of Cost as a Factor in Selection of Con-
trols. "Even assuming that Congress required EPA to com-
pare the cost-of-tons reduced," Appalachian Power argues, 
EPA's comparison "is unlawful because it does not make cost 
a significant, much less a determinative factor." App. Pwr. 
Br. at 37. Appalachian Power contends that this is the result 
of EPA's choice of methodology, because when one uses a 


fraction that divides costs by tons-removed, the fraction is 
"driven" by the denominator. Id. at 37-38. The proof that 
this is so assertedly is in the results that EPA's comparison 
test produces: the "costs" of the controls EPA has selected 
for Group 2, Appalachian Power claims, are "three to seven 
times higher than the costs of [low-NOx] burners." Id. at 37-
38 & n.119.

 On its face, this is a difficult argument to understand. The 
key is to recognize that the argument actually mischaracter-
izes itself: it does not assume, as it claims, that the relevant 
"costs" are $/ton-removed, but rather assumes they are 
$/kwh. When Appalachian Power says the "costs" of the 
Group 2 controls are three to seven times the costs of Group 
1 low NOx burners, it can say so only by measuring those 
costs by $/kwh--which is what it does. See id. at 38 n.119. 
Hence, in this argument Appalachian Power does not assume 
the validity of the measurement EPA has chosen, but simply 
relitigates, in different terms, the same argument we have 
rejected above.

 b. Weight Given to Smaller Boilers. Appalachian Power 
contends that EPA manipulated its methodology to give 
unfair weight in Group 1 to smaller, underutilized boilers that 
are not cost-effective to retrofit with any controls, while 
giving more weight in Group 2 to larger, higher-utilized, and 
therefore more cost-effective boilers. This unfair comparison 
was made, Appalachian Power asserts, in order to ensure that 
high $/ton-removed Group 2 technologies would still be com-
parable to Group 1 controls.

 We see no evidence of this manipulation. Instead, as we 
have noted, EPA made a number of statistical adjustments, 
and in particular excluded figures for boilers in the top and 
bottom 10th percentiles, precisely to ensure that neither the 
lowest nor the highest cost projects skewed the comparison. 
See EPA Response to Comments at 91-92 (J.A. 216-17). The 
agency's decisions not to impose limits on two types of Group 
2 boilers because those boilers did not pass its cost-


comparability test, and to exclude from consideration one 
kind of Group 2 control technology because it was too costly 
for two types of Group 2 boilers, are further evidence that 
EPA did not intentionally manipulate its methodology in 
order to ensure that expensive Group 2 controls would appear 
cost-effective.36

 c. Calculation of Cost-Effectiveness of Low-NOx Burners. 
Appalachian Power argues that EPA artificially inflated the 
costs of Group 1 controls, as compared to Group 2 controls, 
by not excluding from its database "a few extraordinarily 
high-cost" boilers in one of the two Group 1 categories 
(tangentially fired boilers). It contends that a total of ten 
specific Group 1 units (located at the Conemaugh, Shawville, 
and Joppa power plants) actually employ both low NOx 
burners (the only required Group 1 technology) and technolo-
gy "beyond low NOx burners." It also contends that in 
calculating the costs of these units, EPA arbitrarily attributed 
most of the overall project costs to the low NOx burners. 
Similarly, Appalachian Power argues that another two Group 
1 units were "high-cost outliers" that should have been ex-
cluded from the database because they use a "novel burner" 
with extraordinarily high costs.

 We have carefully considered the record with respect to 
these charges, but find little with which to work. Some of 
Appalachian Power's arguments appear to be incorrect factu-
ally. The allocation of costs between low NOx burners and 
additional technology in some of the questioned units, for 

__________
 36 Appalachian Power also argues that for boilers of similar size 
and utilization, the $/ton-removed costs for two kinds of Group 2 
controls are higher than the $/ton-removed costs for Group 1 
controls. As EPA replies, however, the statute does not require 
that "comparability" be established on a size-of-boiler basis. The 
statistical parameters set by EPA and noted above reflect a reason-
able attempt by the agency to account for the range of costs of 
different control technologies operating in different sizes and cate-
gories of boilers.


example, was based on estimates provided by the utilities 
themselves. See J.A. 1828-68; EPA Response to Comments 
at 91 (J.A. 216). Although the allocation in the other units 
was based on EPA's own estimates, see EPA Response to 
Comments at 90-91 (J.A. 215-16), Appalachian Power does 
not explain the manner in which it was "arbitrary." And 
there is simply a factual dispute between Appalachian Power 
and EPA as to whether the burners in the remaining two 
units are "novel" or not. Compare App. Pwr. Br. at 41, with 
EPA Response to Comments at 352-53, 358-59 (J.A. 475-76, 
481-82). We will not substitute our judgment for EPA's in 
this highly technical area. See Troy Corp. v. Browner, 120 
F.3d 277, 283 (D.C. Cir. 1997).

 d. Calculation of the Cost-Effectiveness of Gas Reburn. 
On the other side of the equation, Appalachian Power argues 
that EPA artificially depressed the cost of one particular 
Group 2 control technology--gas reburn--by using national 
rather than regional projections of an important element of 
its cost, namely the price of natural gas. It also contends 
that gas reburn is not truly an "available" technology, be-
cause it has been used only in two small boilers in the United 
States. Hence, Appalachian Power contends, EPA's predic-
tions of the cost of this Group 2 technology are arbitrary. 
The statute bars us from considering the first argument 
because it was not raised with the agency during the rule-
making. See 42 U.S.C. s 7607(d)(7)(B); EPA Br. at 50-51. 
The second argument is answered adequately by EPA's reli-
ance on experience with gas reburn in boilers outside the 
United States, see EPA Response to Comments at 206-07 
(J.A. 330-31); J.A. 1904-06. Nothing in the statute bars 
EPA from considering such data.

 e. Calculation of Cost-Effectiveness of Selective Catalytic 
Reduction. Appalachian Power also launches an attack on 
the methodology used to determine the cost-effectiveness of 
another Group 2 technology, selective catalytic reduction 
("SCR"). In order to assess the cost-effectiveness of SCR, 
EPA had to determine the predicted use of boilers in the year 


2000. To do this, it employed a statistical model known as 
the Integrated Planning Model ("IPM") and conducted a 
number of runs of the model using varying assumptions. As 
we have noted in Part II.A above, our consideration of EPA's 
use of computer models proceeds with considerable deference 
to the agency's expertise. See American Iron & Steel Inst., 
115 F.3d at 1005; Chemical Mfrs. Ass'n, 28 F.3d at 1264-65.

 Appalachian Power contends that EPA did not give suffi-
ciently early notice of the assumptions it would use in the 
IPM, nor of the results of a June 1996 run of the model in 
which SCR proved less cost-effective than in the April run 
that was used in developing the final rule. The IPM's 
predictions for boiler utilization in the year 2000, as well as 
the final assumptions of the model and the results of the 
contested June 1996 modeling run, were not placed in the 
rulemaking docket until November 22, 1996--two and a half 
weeks before EPA signed the final rule on December 10, 
1996.37 Although the two-and-a-half week notice period is 
certainly short, under the circumstances of this rulemaking 
discussed below, we find it adequate. Cf. Natural Resources 
Defense Council v. Thomas, Inc., 838 F.2d 1224, 1242-43 
(D.C. Cir. 1988) (finding two-week comment period adequate).

 In its January 1996 proposed rule, EPA initially announced 
that it would use a model called the Coal and Electric 
Utilities Model ("CEUM") to predict boiler utilization in the 
year 2000. However, commenters, including some of the 
utilities petitioning here, submitted criticisms of the CEUM 
while noting advantages of the IPM. See J.A. 1409, 1416-17; 
61 Fed. Reg. at 67,143; EPA Response to Comments at 94-
100, 354-58 (J.A. 219-25, 477-81). EPA concluded that it 
should use the IPM instead because it had been used by 

__________
 37 Although Appalachian Power initially contended that it did not 
learn this information until December 1996, at oral argument its 
counsel did not contest that it had the information as of November 
22, 1996.


numerous major utilities, again including some petitioning 
here, for their own planning purposes, see EPA Response to 
Comments at 95 (J.A. 220). In April 1996, at a public forum 
on a related regulatory initiative, EPA provided documenta-
tion of how the model was used and of actual model runs, and 
requested comments. Again, commenters, including some 
petitioning here, made submissions and the agency made 
further adjustments to the model's assumptions. In April, 
the agency conducted a run of the model incorporating these 
changes and then used it to formulate the final rule at issue 
here. Subsequently, EPA made additional changes in the 
model's assumptions, and then reran the model in June. See 
id. at 95-96, 354 (J.A. 220-21, 477). In September, EPA met 
again on the related initiative with some of the petitioners 
here, and further explained the IPM. See id. at 354 (J.A. 
477). And on November 22, the IPM's final assumptions and 
predictions, as well as the results of the contested June 1996 
modeling run, were placed in the rulemaking docket.

 Viewed in this context, as part of a series of refinements in 
the agency's model in response to the suggestions of commen-
ters, we conclude that the relatively short period available for 
further submissions at the end of the rulemaking was reason-
able. The agency's use of the IPM in these circumstances 
constituted a "logical outgrowth" of its original proposal. See 
Fertilizer Inst., 935 F.2d at 1311. Hence, we find no proce-
dural violation.

 Moreover, as we have previously noted, even if the late 
filing of the final IPM materials had constituted procedural 
error, we may invalidate a Clean Air Act rule for procedural 
errors "only if the errors were so serious and related to 
matters of such central relevance to the rule that there is a 
substantial likelihood that the rule would have been signifi-
cantly changed if such errors had not been made." 42 U.S.C. 
s 7607(d)(8). Yet, Appalachian Power does not even express-
ly make this assertion. We interpret its point about the June 
1996 run as implying that if Appalachian Power had known 
about it earlier, it would have called it to EPA's attention, and 
that as a consequence EPA would not have used SCR in 
determining the Group 2 rates. The flaw in this argument is 


that EPA did not need Appalachian Power's help to learn of 
the results of its own modeling run. Nor did EPA ignore 
those results. EPA conducted a sensitivity analysis of the 
differences between the April and June runs, in order to 
determine whether the differences were sufficiently signifi-
cant to affect the final rule. See EPA Response to Comments 
354-55 (J.A. 477-78). Based on that analysis, EPA concluded 
that the April run provided a reasonable basis for establishing 
the limits in the final rule, and that using the June run would 
not significantly change those limits. See id. at 357 (J.A. 
480). Although EPA set out its sensitivity analysis in detail 
in its final Response to Comments, see id. at 355-360 (J.A. 
478-83), Appalachian Power has not attempted to identify any 
defect in that analysis, and hence cannot establish that earlier 
docketing of the June run would have led to a significant 
change in the final rule.

 In addition to attacking the IPM, Appalachian Power also 
challenges what it characterizes as "other assumptions" relat-
ing to SCR. Again, Appalachian Power gives us little with 
which to work. It lists a number of asserted flaws in EPA's 
methodology which, it says, are merely "examples" of the 
agency's bias in favor of this technology. But EPA adequate-
ly responded to each of these challenges during the rulemak-
ing,38 and Appalachian Power provides no basis for question-

__________
 38 Appalachian Power argues, "for example," that EPA's model 
excluded from the calculation of Group 2 costs the cost of so-called 
"scope adders"--other work completed at the same time as the 
installation of NOx control equipment. The exclusion was appropri-
ate, however, because scope adders are usually not part of the NOx 
reduction effort, and, in any event, these costs were excluded from 
the calculation of both Group 2 and Group 1 costs. See 61 Fed. 
Reg. at 67,144-45, 67,147; EPA Response to Comments at 172-74 
(J.A. 296-98). Appalachian Power also contends that rather than 
obtain site-specific cost information from the electrical utilities, 
EPA's model used a statistical technique known as "power law 
scaling" to estimate the capital costs for larger boilers based on 
actual data from smaller boilers in the same category. But the 
technique, which also is employed by electric utilities, see EPA 
Response to Comments at 135-37, 351-52 (J.A. 259-261, 474-75); 
J.A. 680-84, is reasonable because EPA used it where the data 
offered by the utilities consisted of estimates that were insufficient-
ly supported, see 61 Fed. Reg. at 67,148-49; EPA Response to 


ing the agency's assumptions regarding SCR in any larger 
sense.

 Finally, Appalachian Power contends that EPA did not 
select SCR or gas reburn as a basis for the emission limit for 
wet bottom boilers until the announcement of the final rule. 
Although Appalachian Power is correct that SCR and gas 
reburn were not specifically proposed for wet bottom boilers, 
the agency's proposed rule did solicit comments regarding the 
use of both technologies in such boilers. See 61 Fed. Reg. at 
1464, 1474 (gas reburn); id. at 1457 (SCR). Commenters 
clearly understood that these technologies were under consid-
eration, as the agency received comments on them from 
several sources, see J.A. 905-09, 1063-81; 61 Fed. Reg. at 
67,150-51; EPA Response to Comments at 232-36, 360 (J.A. 
356-60, 483), including some of the utilities petitioning here, 
see J.A. 989-91, 1004-116, 1169-72. As we have noted, this 
kind of agency modification of a proposed rule, in response to 
the comments it solicited and received on alternative possibili-
ties, complies with the requirements of administrative law. 
See Natural Resources Defense Council, 838 F.2d at 1242; 
Small Refiner Lead Phase-Down Task Force v. EPA, 705 
F.2d 506, 547 (D.C. Cir. 1983).

 f. Subcategorization of Boiler Types. Appalachian Power 
challenges EPA's failure to adopt a proposal to regulate as 
separate subcategories, or to exclude from regulation alto-
gether, those Group 1 and 2 boilers where retrofitting alleg-
edly could damage the units or only be accomplished at high 
cost. As EPA notes, however, the statute establishes specific 
categories of boilers (two Group 1 categories and four Group 
2 categories, see supra notes 4-5), and does not contemplate 
further subcategorization or boiler-by-boiler treatment. EPA 
states that it has no evidence to support the claim that boilers 

__________
Comments at 174-87 (J.A. 298-311). As yet another "example," 
Appalachian Power contends that EPA assumed a price for ammo-
nia, consumed in large quantities during the SCR process, that 
appears lower than the price reported by the utilities. EPA 
correctly points out that the disparity is due to the fact that EPA's 
price was expressed in 1990 dollars. See EPA Response to Com-
ments at 176-77, 185 (J.A. 300-01, 309).


in Appalachian Power's proposed subcategories cannot in 
general achieve the same emission rates as other boilers in 
the statutory categories, see EPA Response to Comments at 
67 (J.A. 192), and Appalachian Power has offered nothing to 
justify disturbing this agency conclusion. EPA further notes 
that its statistical methodology took account of the range of 
cost-effectiveness of boilers within categories, and that the 
remedy for the owner of an individual unit that cannot 
achieve category limits is to request an alternative emission 
limit under 42 U.S.C. s 7651f(d), or to seek permission to 
average emissions from several units under 42 U.S.C. 
s 7651f(e). See EPA Response to Comments 67, 254 (J.A. 
192, 378). EPA's response to this proposal is reasonable, and 
its rejection of the proposal is neither arbitrary nor capri-
cious.

 g. Consideration of Environmental Impacts in Setting 
Limits. Finally, intervenor NMA argues that EPA improp-
erly relied on an irrelevant factor--the environmental impacts 
of the rule--when setting the NOx emission limits for Group 2 
boilers. This argument is answered, however, by the plain 
language of section 407(b)(2), which requires EPA to consider 
environmental impacts. See 42 U.S.C. s 7651f(b)(2) (direct-
ing EPA to set emission limits and "base such rates on the 
degree of reduction achievable through the retrofit applica-
tion of the best system of continuous emission reduction, 
taking into account available technology, costs and energy 
and environmental impacts ....") (emphasis added).39

__________
 39 NMA also argued that "the Coal Industry did not know until 
the final rule" that EPA intended to consider the adverse environ-
mental effects of NOx in setting emission rates. NMA Br. at 13. 
In fact, EPA gave notice in its initial proposal that it intended to do 
so. See 61 Fed. Reg. at 1442, 1453-55. Nor do we find support for 
NMA's brief, unfleshed-out allegation that even if EPA were enti-
tled to consider environmental impacts, it did so unreasonably. See 
NMA Br. at 9-10. EPA moved to strike NMA's entire argument 
regarding the consideration of environmental factors in setting 
Group 2 limits, on the ground that no petitioner had raised it. 
Although the question is close, there is much to be said for EPA's 
contention that intervenor NMA impermissibly has enlarged the 
issues before this court. See, e.g., Public Serv. Co. of Colo. v. 


 In sum, finding none of petitioners' challenges to the Group 
2 emission limits persuasive, we uphold the limits EPA estab-
lished for boilers in that Group.

 C. The Compliance Deadline

 Appalachian Power also challenges EPA's assertion that, 
pursuant to section 407(a), the new emission limits must be 
met by January 1, 2000. Section 407(a) provides:

 On the date that a coal-fired utility unit becomes an 
 affected unit pursuant to sections 7651c [Phase I sulfur 
 dioxide requirements], 7651d [Phase II sulfur dioxide 
 requirements], [or] 7651h [repowered sources] of this 
 title, or on the date a unit subject to the provisions of 
 section 7651c(d) or 7651h(b) of this title, must meet the 
 SO2 reduction requirements, each such unit shall become 
 an affected unit for purposes of this section and shall be 
 subject to the emission limitations for nitrogen oxides set 
 forth herein.

42 U.S.C. s 7651f(a). Because a Phase I "affected unit" 
(defined as "a unit that is subject to emission reduction 
requirements or limitations under this subchapter," 42 U.S.C. 
s 7651a(2) (1994)) must come into compliance with sulfur 
dioxide emissions limits by January 1, 1995, and because a 
Phase II affected unit must comply by January 1, 2000, EPA 
stated in the final rule that the deadline for compliance with 
the new NOx emission limits for Group 1, Phase II boilers and 
for Group 2 boilers would be January 1, 2000. See 61 Fed. 
Reg. at 67,154. Appalachian Power argues, however, that 
section 407(a) does not require such a deadline--that, in fact, 
the only statutory deadline is that included in the last sen-
tence of section 407(b)(1), which states that "[a]fter January 
1, 1995, it shall be unlawful" for Group 1, Phase I boilers to 
emit NOx in excess of the established emission rates. See 42 
U.S.C. s 7651f(b)(1). As a result, Appalachian Power argues, 

__________

FERC, 91 F.3d 1478, 1488 n.3 (D.C. Cir. 1996), cert. denied sub 
nom. Amoco Prod. Co. v. Public Serv. Co. of Colo., 117 S. Ct. 1723 
(1997); Time Warner Entertainment Co. v. FCC, 56 F.3d 151, 202 
(D.C. Cir. 1995), cert. denied, 116 S. Ct. 911 (1996). However, since 
EPA easily prevails on the merits of NMA's argument, we see no 
harm to EPA in denying its motion.


EPA must otherwise justify its decision to establish a compli-
ance deadline of January 1, 2000.

 Before reaching the merits of this argument, we must first 
dispose of a procedural issue. Appalachian Power's comment 
on the compliance deadline during the notice-and-comment 
period argued that, unlike other statutory sections, section 
407(b)(2) contains no date after which "it shall be unlawful" to 
exceed the emission limitations set under the section. Appa-
lachian Power's current argument points out the anomaly of 
construing the "plain language" of the statute as establishing 
a compliance date for Group 2, Phase I boilers given that 
these boilers become "affected units" in 1995, while the Group 
2 limits are not required to be promulgated until 1997. EPA 
seizes on the difference between these two challenges to 
argue that because Appalachian Power failed to raise its 
current argument before EPA during the notice-and-
comment period, its challenge should be considered waived. 
We disagree. It is true that under the Act, only an objection 
to a rule or procedure that was raised with "reasonable 
specificity" during the comment period may be raised during 
judicial review. 42 U.S.C. s 7607(d)(7)(B). But the word 
"reasonable" cannot be read out of the statute in favor of a 
hair-splitting approach. In other words, the Act does not 
require that precisely the same argument that was made 
before the agency be rehearsed again, word for word, on 
judicial review. The purpose of the exhaustion requirement 
is to ensure that the agency is given the first opportunity to 
bring its expertise to bear on the resolution of a challenge to 
a rule. See, e.g., Fertilizer Inst., 935 F.2d at 1312-13 (citing 
Cutler v. Hayes, 818 F.2d 879, 890-91 (D.C. Cir. 1987)) 
(discussing general exhaustion requirement). So long as 
EPA has considered the particular challenge raised on judi-
cial review, it is of no import whether that challenge is 
phrased in exactly the same way in each forum. Appalachian 
Power's argument regarding the compliance deadline during 
the comment period--in substance, if not in form, the same 
objection now raised--was sufficient to put EPA on notice of 
a challenge to its claim that it was bound by the statute in 


setting the compliance date for the Group 1, Phase II boilers 
and the Group 2 boilers at January 1, 2000.

 EPA's reliance on Ohio v. EPA, 997 F.2d 1520 (D.C. Cir. 
1993), is therefore unavailing. In that case, we rejected the 
petitioners' contention that a comment challenging EPA's 
definition of "onsite" as limited to contiguous areas was 
sufficient to raise a challenge to EPA's proposed treatment of 
noncontiguous but reasonably related facilities as a single 
site, noting that "this minimal reference to the contiguity 
issue is so tangential to the principal thrust of the comment 
that it cannot fairly be said to have been presented to EPA 
for resolution." Id. at 1550. This case is distinguishable 
from Ohio, in which two distinct actions were challenged: 
EPA's treatment of contiguous areas as "onsite" and EPA's 
treatment of reasonably related noncontiguous areas as a 
single site. Here, both challenges were directed at a single 
claim: that EPA had no discretion in setting the compliance 
date.

 Even if Appalachian Power could be deemed not to have 
raised this argument before the agency, we have noted that 
EPA "retains a duty to examine key assumptions as part of 
its affirmative 'burden of promulgating and explaining a non-
arbitrary, non-capricious rule' " and therefore that "EPA 
must justify that assumption even if no one objects to it 
during the comment period." Small Ref. Lead Phase-Down 
Task Force, 705 F.2d at 534-35 (quoting National Lime, 627 
F.2d at 433). Because the compliance date for a particular 
rule would almost certainly be included with these "key 
assumptions," we are not prohibited from considering Appala-
chian Power's argument.

 Given that the issue is properly before us, we go on to 
decide whether EPA's conclusion that the statute requires a 
January 1, 2000, compliance date is valid. EPA argues that 
because Phase II units must meet the SO2 requirements by 
January 1, 2000 (see 42 U.S.C. s 7651d(a)), section 407(a), by 
using the SO2 deadline as the deadline for NOx compliance, 
also requires a deadline of January 1, 2000. Appalachian 
Power challenges this conclusion, arguing that pursuant to 


this logic, the compliance date for Group 2, Phase I boilers 
would be January 1, 1995 (the date on which they became 
"affected units" for SO2), a date prior to the promulgation of 
the emission limits at issue. Rather, Appalachian Power 
argues, section 407(a) identifies which units are subject to the 
NOx program, not when they must comply with regulations 
issued under the section. Because Congress set a compliance 
date of January 1, 1995, for Group 1, Phase I boilers and did 
not set any other deadlines in the section, Appalachian Power 
argues that Congress left it to EPA's discretion to set a 
compliance date for the remaining boilers.

 We are presented with a question of statutory interpreta-
tion, so once again we conduct a Chevron analysis to deter-
mine, first, whether Congress has spoken on the issue of the 
compliance deadline for Group 1, Phase II units and Group 2 
units, and, second, if Congress has not so spoken, whether 
EPA's selection of a January 1, 2000, deadline was a reason-
able interpretation of the statutory scheme.

 A careful reading of section 407 leads us to the conclusion 
that Congress did not include a specific compliance date for 
NOx emission limits promulgated under section 407(b)(2). 
While section 407(a) does state that the date that a boiler 
becomes "subject to" any NOx limitations is the same date 
that it becomes an affected unit for purposes of SO2 emission 
limitations--January 1, 1995, for Phase I units and January 1, 
2000, for Phase II units--we do not interpret the phrase 
"subject to" to mean "must be in compliance with." To do so 
would render the last sentence of section 407(b)(1), which 
establishes a compliance date of January 1, 1995, for Group 1, 
Phase I boilers, superfluous. Because we should refrain from 
interpreting a statutory provision in a way that creates 
surplusage, see, e.g., Motor and Equipment Mfrs. Ass'n, Inc. 
v. EPA, 627 F.2d 1095, 1108 (D.C. Cir. 1979), we conclude 
that the inclusion of a specific compliance date in section 
407(b)(1) means that the phrase "subject to" in section 407(a) 
cannot refer to compliance. (This conclusion does not, howev-
er, render the phrase meaningless; rather, it may mean 
simply that each boiler becomes subject to regulation under 
the NOx program at the same time it becomes subject to the 


SO2 program; once subject to regulation, a boiler is required 
to meet the compliance date of any NOx emission limits 
promulgated.) As a result, because section 407(b)(2) does not 
specify a compliance date, it would appear that Congress did 
not intend to set a compliance date for these boilers. This 
conclusion is bolstered by the fact that reading a compliance 
date into section 407(a) would, as Appalachian Power points 
out, result in the requirement that Group 2, Phase I boilers 
comply in 1995 with a regulation not promulgated until 1997. 
We cannot conclude that Congress desired such an absurd 
result.

 Because our reading of the statute reveals a gap to be filled 
by EPA, we next determine, under the second step of the 
Chevron analysis, whether EPA's resolution--designating 
January 1, 2000, as the compliance date for both Group 1, 
Phase II boilers and all Group 2 boilers--is reasonable.40 We 
believe that it is. A compliance date of January 1, 2000, 
provides utilities with at least two years of lead time to 
prepare for compliance, a period at least twice as long as the 
preparation time for the 1995 emission limits and one that 
"reflects the relative difficulty of controlling NOx for [Group 

__________
 40 As Appalachian Power notes, we have previously held that 
"when an agency's decision rests on a supposed mandate by Con-
gress and the agency is later determined to be wrong as to the 
mandate, a remand may be required for it to exercise its discretion 
on the issue." General Motors Corp. v. National Highway Traffic 
Safety Admin., 898 F.2d 165, 171 (D.C. Cir. 1990). In this case, 
however, remand would be an exercise in futility because EPA has 
already stated in the preamble to the final rule that even if the 
compliance-date provisions are considered to be ambiguous, "the 
Agency maintains that its interpretation is reasonable." 61 Fed. 
Reg. at 67,155 n.24. It is evident that EPA considered environmen-
tal concerns as an alternative reason for setting the compliance 
deadline at January 1, 2000. See, e.g., EPA Response to Comments 
at 270 (delaying compliance beyond January 1, 2000, would cause 
"unnecessary environmental harm"). Thus, this is not a case in 
which EPA has "stopped at text and history without weaving into 
the calculus policy and administrative concerns," General Motors, 
898 F.2d at 172, which might compel us to remand.


2] technologies," S. Rep. No. 101-228, at 332. In addition, 
January 1, 2000, is the date by which the Phase II boilers 
must comply with the SO2 limits and is the last such compli-
ance date explicitly mentioned in Title IV (save for section 
409(b)(1), which permits an extension of the compliance date 
for repowered sources from January 1, 2000, to December 31, 
2003, see 42 U.S.C. s 7651h(b)(1) (1994)). Given these consid-
erations, we can find no reason to conclude that a January 1, 
2000, compliance date is unreasonable, and thus we decline to 
vacate this portion of the rule.

 D. The Classification of Retrofitted Cell Burner Boilers

 In this part we consider the proper classification of one 
kind of dry bottom wall-fired boiler (hereinafter, "wall-fired 
boiler"), known as a "cell burner." In such a boiler, two or 
three closely-spaced burners are clustered in "cells," which 
are placed on opposing walls. Under section 407(b), a wall-
fired boiler is classified as Group 1, unless it is a unit 
"applying cell burner technology," in which case it is classified 
as Group 2. Compare 42 U.S.C. s 7651f(b)(1)(B), with 42 
U.S.C. s 7651f(b)(2)(C). The classification is important to the 
boiler's owner, because the Group 1 emission limit for wall-
fired boilers is stricter than the Group 2 limit for cell burners.

 In issuing its final rule, EPA concluded that retrofitting a 
cell burner with "non-plug-in" NOx controls "convert[s]" the 
cell burner to a wall-fired boiler. See EPA Response to 
Comments at 129 (J.A. 253). The agency determined that 
cell burners that were retrofitted prior to the date of enact-
ment of the 1990 amendments (November 15, 1990) should 
therefore be classified as Group 1, wall-fired boilers and 
subject to the more stringent limit. However, EPA permit-
ted those cell burners retrofitted after the date of enactment 
to remain subject to the more lenient limit applicable to 
Group 2.

 As a consequence of EPA's classification decision, petition-
er Arizona Public Service Company ("APS") has two identical 
boilers, one retrofitted in 1989 (Unit 4) and one retrofitted in 
1991 (Unit 5), that are subject to very different emission 
limits. APS charges that the classification of a retrofitted 


cell burner--and particularly its Unit 4--as a wall-fired boiler 
is arbitrary and capricious. It also contends that the distinc-
tion EPA made between retrofitted cell burners, based on the 
date of their retrofitting, is arbitrary and capricious.

 We agree that on the present record EPA has not justified 
its classification of retrofitted cell burners as wall-fired boil-
ers, and hence vacate and remand the issue to the agency for 
further consideration. Because we conclude that EPA has 
not justified the classification of any retrofitted cell burner as 
a wall-fired boiler, we do not consider whether EPA's effort 
to distinguish between retrofits based on the date of retrofit-
ting was also arbitrary.41

 The question whether a retrofitted cell burner can properly 
be classified as a wall-fired boiler turns upon whether a 
retrofitted unit is still a unit "applying cell burner technolo-
gy." 42 U.S.C. s 7651f(b)(1)(B). Neither party contends 
that this question can be resolved under Chevron's step one. 
We agree that neither the statutory language nor the stat-
ute's structure unambiguously decides the issue. There also 
is no indication in the legislative history that Congress consid-
ered the question of the effect of a retrofit on the appropriate 
classification of a cell burner. This is a case in which 
Congress "has not directly addressed the precise question at 
issue," Chevron, 467 U.S. at 843, and we therefore proceed to 
Chevron's step two.

 Under step two, the question is whether the agency's 
interpretation of the statute is reasonable when measured 
against the statute's language, legislative history and pur-
pose. EPA argues that its classification of a retrofitted cell 
burner as no longer "applying cell burner technology" is 
reasonable. In a "non-plug-in" retrofit, portions of the wall 
that held the clustered burners are removed, and more widely 

__________
 41 We do note, however, that EPA made the distinction at least in 
part to benefit utilities like APS, so that some of their units would 
continue within Group 2. Having concluded that all cell burners 
retrofitted with non-plug-in controls are essentially wall-fired boil-
ers, the agency nonetheless agreed to keep those retrofitted after 


spaced burners are installed. EPA argues that once this is 
accomplished, the salient feature of a cell burner--the clus-
tering of burners in cells--has disappeared, and that thereaf-
ter the boiler is wall-fired for all intents and purposes.42

 APS contends, and we agree, that the interpretive question 
is not simply what the retrofitted boiler looks like ("cellular" 
or not), but whether it retains the attributes that Congress 
relied upon in placing cell burners in Group 2. APS argues 
that Congress placed in Group 2 those boilers whose NOx 
emissions were more difficult to control. The conference 
report on the Act's amendments supports this view, see H.R. 
Conf. Rep. No. 101-952, at 344, and the remaining legislative 
history contains no indication of any other rationale Congress 
may have had.

 Using this indication of congressional intent, APS argued in 
the rulemaking that cell burners have a number of relevant 
characteristics, besides the clustering of the burners. Such 
boilers were designed in the 1960s with the purpose of 
concentrating heat in a smaller space. As a consequence, the 
salient physical features are small boiler size as well as the 
location of the burners. The small size, APS argued, leads to 
a higher burner zone release rate ("BZRR") in such a boiler, 
even when the burners are unclustered via retrofitting. See 
APS Comments at 15-16 (J.A. 1038-39). And BZRR, APS 

__________
1990 within Group 2, contending, in part, that this would provide 
utilities with an incentive to retrofit as a way to reduce NOx 
emissions. See EPA Response to Comments at 129 (J.A. 253).

 42 This issue may be one of dwindling significance. Although 
APS retrofitted its units with "non-plug-ins," the only technology 
then available, in the future utilities likely will be able to retrofit 
cell burners with "plug-ins," which replace the existing burners with 
low NOx burners while maintaining the original cell configuration. 
See 61 Fed. Reg. at 1457-58. EPA has not contended that a plug-in 
retrofit converts a cell burner into a wall-fired boiler. Id.


contended, is the driving force behind the high NOx emission 
levels of cell burners. See id. at 15-17 (J.A. 1038-40).43

 Moreover, APS argued, the proof that retrofitted cell burn-
ers are not the functional equivalent of wall-fired boilers is in 
their performance. Retrofitted cell burners have much high-
er emission rates than wall-fired boilers. In fact, APS con-
tended, of the four retrofitted cell burners in the country, 
only two can achieve the Group 1 emission limit for wall-fired 
burners. And those two should not be considered, APS 
further argued, because they achieve the Group 1 limit only 
by using overfire air as well as low NOx burners. See id. at 
15 (J.A. 1038). We agree that the fact that no retrofitted cell 
burner can achieve the Group 1 emission limit using the only 
technology Congress authorized for setting that limit (low 
NOx burner technology) is evidence that retrofitted cell burn-
ers are not the functional equivalent of wall-fired boilers, as 
measured by congressional concerns.

 In the rulemaking, EPA's only response to APS's conten-
tion about the salience of small boiler size and its relationship 
to BZRRs was to say that APS did "not provide[ ] any 

__________
 43 EPA's appellate counsel argues that although the agency 
agrees with APS that Congress placed cell burners within Group 2 
because of the greater difficulty of controlling their NOx emissions, 
Congress attributed this difficulty to the cellular configuration and 
not to the high BZRR. As support, EPA cites a report the 
Department of Energy presented to Congress prior to the passage 
of the 1990 amendments. That report stated that the configuration 
of the burners in cells "results in combustion conditions that 
produce high NOx emissions." Office of Clean Coal Tech., Dep't 
of Energy, Comprehensive Report to Congress Clean Coal Tech-
nology Program: Full-Scale Demonstration of Low-NOx Cell 
Burner Retrofit, at 1 (1990) (J.A. 493). APS notes, however, that 
the same report also refers to the relationship between small boiler 
size, and correlative high BZRR and increased NOx formation. See 
id. at 10 (J.A. 502). Moreover, EPA offers no evidence that 


information supporting [this] claim." EPA Response to Com-
ments at 129 (J.A. 253). This assertion is contradicted by the 
rulemaking record. See APS Comments at 15-17 (J.A. 1038-
40).44 Nor can we find any evidence that EPA responded at 
all to APS's comment that the only retrofitted cell burners 
capable of meeting the more stringent emission limit are 
those boilers that also use overfire air technology. This 
failure to respond adequately to key questions about the 
reasonableness of the agency's position requires a remand. 
See Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. 
Ins. Co., 463 U.S. 29, 43 (1983).

 On appeal, EPA counsel contends that the fact that few if 
any retrofitted cell burners can meet the wall-fired limit does 
not mean the limit is invalid. That, EPA argues, simply puts 
them in the same category as the 12 percent of all wall-fired 
boilers that cannot achieve the standard. As we have agreed 
above, the statute does not require that EPA set limits so 
that all boilers in a category can achieve them. One problem 
with EPA's argument here, however, is that it is an impermis-
sible post hoc rationalization of appellate counsel. See, e.g., 
Unbelievable, Inc. v. NLRB, 118 F.3d 795, 809 n.3 (D.C. Cir. 
1997). The larger problem is that it assumes the point that is 
at issue, i.e., that the retrofitted cell burners are wall-fired 
boilers. If they are, then EPA is correct that any individual 
unit's inability to meet the Group 1 limit does not invalidate 
the standard as a whole. But APS points to these units' 
inability to achieve the Group 1 limit not as part of an attack 
on the overall standard, but rather as evidence that EPA's 
effort to equate retrofitted cell burners and wall-fired boilers 
is invalid. EPA, even through its counsel, does not answer 
this argument.

__________
Congress relied on or was aware of this report when enacting the 
1990 amendments.

 44 On appeal, EPA also takes issue with APS's data on BZRRs. 
As EPA did not raise this objection during the rulemaking, we 
reject it now as an impermissible post hoc rationalization, see 
Unbelievable, Inc. v. NLRB, 118 F.3d 795, 809 n.3 (D.C. Cir. 1997), 
but pass no judgment on its merit upon remand.


 Because EPA has not adequately justified its treatment of 
retrofitted cell burners as wall-fired boilers, we vacate and 
remand the issue to the agency for reconsideration or a more 
adequate justification.

 III. Conclusion

 For the foregoing reasons, we uphold EPA's NOx emission 
limits for the Group 1, Phase II boilers, the emission limits 
for the Group 2 boilers, and the compliance date of January 1, 
2000, as neither exceeding EPA's statutory authority under 
Title IV of the Clean Air Act nor arbitrary and capricious. 
We thus deny Appalachian Power's petition for review in its 
entirety. However, we grant APS's petition for review, va-
cate EPA's classification of certain retrofitted cell burners as 
wall-fired boilers as arbitrary and capricious, and remand to 
the agency for reconsideration or a more adequate explana-
tion.

It is so ordered.